Klever Belisario MIRANDA, Nancy Clotilde Campoverde, and Cesar Miranda, Appellants,

v.

Michael H. SAID and Law Office of Michael H. Said, P.C., Appellees.

No. 11–0552.

Supreme Court of Iowa.

July 19, 2013.

Rehearing Denied Sept. 11, 2013.

Angela L. Campbell of Dickey & Campbell Law Firm, PLC, Des Moines, for appellants.

Eric G. Hoch and Kevin J. Driscoll of Finley, Alt, Smith, Scharnberg, Craig, Hilmes & Gaffney, P.C., Des Moines, for appellees.

CADY, Chief Justice.

In this appeal from a judgment entered for the plaintiffs in a legal malpractice action, we must determine if the district court erred in concluding the plaintiffs failed to state a claim for emotional distress and punitive damages as a matter of law. On our review, we affirm the decision of the court of appeals, reverse the deci-

sion of the district court, and remand for a new trial on damages.

## I. Background Facts and Prior Proceedings.

Klever Miranda and Nancy Campoverde are Ecuadorian citizens who emigrated to the United States. Their children, including Cesar, joined them in 1995. Cesar was fourteen years old at the time. In 1998, Klever and Nancy gave birth to another son, Ronaldo, in the United States.

Klever and Nancy entered the United States without documentation. Klever initially obtained employment under a pseudonym, but eventually began to take action to obtain legal immigration status with the aid of an attorney. At some point in the late 1990s, Klever obtained legal authorization to work in the United States, but later lost that status. Klever also filed an asylum application.

In 2005, Klever received notice of a removal order. He was represented by attorney Michael Said. Klever wanted to remain in the United States and obtain citizenship. Said advised Klever that the best plan of action would be for him to return to Ecuador and have Cesar sponsor him and Nancy for citizenship once Cesar obtained citizenship. He advised Klever that Cesar could file a document called Form I-130, which permits a citizen to sponsor a relative's application for citizenship. According to Said, Klever and Nancy could then each file a document called Form I-601 waiver, which permits an applicant who is otherwise ineligible, to be admitted into the country based on "extreme hardship" to a qualifying relative. *See* 8 U.S.C. § 1182(i) (2006).[1]

Said allegedly told Klever and Nancy his plan contained no risks and had a ninety-nine percent chance of success. Said allegedly explained the plan would only fail if Cesar was not related to Klever and Nancy or had committed a crime in the United States or Ecuador. Said did not advise Klever and Nancy of any other options to consider because he did not believe any other options existed.

Pursuant to the plan conceived by Said, Klever left for Ecuador in 2005. Before Nancy left in 2007, Said completed the Form I-601 waiver documents so she could have them in her possession to file with the Ecuadorian consulate once Cesar became a citizen. Said also prepared a memorandum for each waiver application. The memorandums detailed the extreme hardship that would befall Klever and Nancy if their applications were denied. Said wrote in Klever's memorandum:

> [B]oth the Petitioner's family as well as the Petitioner would suffer extreme hardship if his request for a waiver is not granted. The Petitioner's family consists of two United States Citizen children, one of whom is under the age of 18, and two United States Citizen grandchildren. It is the separation of the Petitioner from his young son that is most troublesome. The Petitioner's child is a United States Citizen and having been born in the United States does not know of any life outside of his current situation. He does not speak fluent

---

1. Section 1182(i)(1) provides:

 The Attorney General may, in the discretion of the Attorney General, waive the application of clause (i) of subsection (a)(6)(C) of this section in the case of an immigrant who is the spouse, son, or daughter of a United States citizen or of an alien lawfully admitted for permanent residence if it is established to the satisfaction of the Attorney General that the refusal of admission to the United States of such immigrant alien would result in extreme hardship to the citizen or lawfully resident spouse or parent of such an alien. . . .

Spanish nor will he be able to maintain his current health and educational [level] in Ecuador. Moreover, the separation of the child from his father would further broaden the symptoms of the disorder such as, increasing his level of low self-esteem, furthering his fearfulness of risks, and promoting poor concentration.

The son and grandchildren of the Petitioner would also suffer detriment if they followed their father and grandfather to live in Ecuador because the children were all born here in the U.S. and do not speak the language fluently. Likewise, if the children remained in the U.S. without the presence of their father and grandfather, their emotional well-being would be substantially at risk. Numerous studies have demonstrated that extreme hardship occurs to children when parents are separated. . . . The study notes that children who were unable to adjust to the separation of their parents often had problems such as expulsion from school, juvenile delinquency with the law, and emotional outbreaks.

Moreover, the Petitioner is diabetic and is unable to obtain the necessary care in Ecuador. He and his family worry that his health is rapidly declining and that he will be unable to pay for any medical necessities that he may have with regard to his current health condition. The Petitioner and his family are extremely anxious as to what could happen if his condition does worsen and he is without proper medical care and the care of his immediate family to help care for him.

. . .

The impact of separation is not exaggerated especially when factors such as the remoteness of the border from Iowa which limits frequent visitation and the exorbitant telephone rates which restricts communication between the family members further. These barriers alone can lead to depression, grief, and impoverishment to any or all family members.

The memorandums were substantially similar. Klever and Nancy paid Said $11,000 for his legal services.

Before Nancy left for Ecuador, she asked Said if the applications would be successful, stating she would prefer to remain in the United States if the applications would not be successful. Said reiterated his belief that the plan had a ninety-nine percent likelihood of success. Nancy left the United States, knowing Cesar was very close to obtaining his citizenship. Believing she would be returning to the United States within a short period of time, she only packed one suitcase.

Cesar became a citizen a short time later. He promptly filed the Form I-130 documents Said had prepared in advance. Klever and Nancy then each filed the Form I-601 with the Ecuadorian consulate. However, their applications were denied. The Ecuadorian consulate also informed Klever and Nancy that they were subject to a ten-year bar to readmission because they had left the United States voluntarily. *See id.* § 1182(a)(9)(B)(i).[2] Klever, Nancy, and Cesar were distraught.

Klever and Nancy later learned that Form I-601 waivers are only available when the *qualifying relative* is the spouse or parent of the applicant. *Id.*

---

2. This section provides:
 Any alien (other than an alien lawfully admitted for permanent residence) who . . . has been unlawfully present in the United States for one year or more, and who again seeks admission within 10 years of the date of such alien's departure or removal from the United States, is inadmissible.
 8 U.S.C. § 1182(a)(9)(B)(i).

§ 1182(i)(*l*). The Form I-601 applications prepared by Said listed Cesar and Ronaldo—their children—as qualifying relatives. In truth, Klever and Nancy had no qualifying relatives.

Klever, Nancy, and Cesar brought a legal malpractice action against Said. The action included a claim for emotional distress damages, as well as punitive damages. The case ultimately proceeded to trial. As a part of their case, Klever and Nancy called an expert witness who opined that the strategy pursued by Said likely had no chance of success.

Said admitted at trial he knew Cesar and Ronaldo were not qualifying relatives. He also stipulated that no reasonable attorney would have attempted to use a Form I-601 to obtain lawful residency for Klever and Nancy. Nevertheless, Said maintained that he had been successful ten to fifteen times in the past using children as qualifying relatives. Said testified that, in his experience, consular officials used discretion to grant Form I-601 waivers when a child of the applicant was the sponsor.

Klever and Nancy's expert testified that the immigration statute only grants consular officials discretion to reject the application of an applicant who meets the statutory minimum requirements but is undesirable for other reasons. Klever and Nancy's expert further testified that officials had no discretion to grant applications of individuals who do not meet the minimum requirements. Moreover, Klever and Nancy's expert testified that even if a consular agent had granted the waivers in contravention of the statute, the

error would have been noticed when they applied for citizenship. In turn, the error would have foreclosed the opportunity for Klever and Nancy to become citizens. Instead of obtaining citizenship, Klever and Nancy would have been deported.

Although Said claimed previous success in using children as qualifying relatives, he failed to produce any documentation of this success, despite his claim that such records existed and despite a court order to produce the records.[3]

Prior to submitting the case to the jury, the district court granted Said's motion for directed verdict on the claims for emotional distress and punitive damages. It held that past and future emotional distress damages were not available. The court acknowledged emotional distress is more likely in the immigration context, but concluded the evidence failed to satisfy the legal standard for emotional distress damages in negligence actions. The court also held that punitive damages were not available in this case, reasoning Klever and Nancy had proffered no evidence suggesting willful, wanton, or reckless conduct. Thus, the district court only allowed the claim for economic damages to be considered by the jury. This claim was based on the attorney fees paid to Said. Ultimately, the jury found Said negligent and awarded Klever and Nancy $12,500.

Klever and Nancy appealed. Among other issues, they argued the district court erred in failing to submit their claim for emotional distress and punitive damages.

We transferred the case to the court of appeals. It reversed the district court decision and found that the claims for emo-

---

**3.** The district court granted plaintiffs' request for an adverse-inference instruction based on the failure of Said to produce records that showed his purported success in using children as the qualifying relative. An adverse-inference instruction would allow, but not require, the jury to draw an inference from the nonproduction of documents that the documents did not exist. *See Phillips v. Covenant Clinic,* 625 N.W.2d 714, 718 (Iowa 2001); *Hendricks v. Great Plains Supply Co.,* 609 N.W.2d 486, 491 (Iowa 2000).

tional distress and punitive damages should have been submitted to the jury. It also found the district court erred in dismissing Cesar from the case but affirmed the district court on all remaining issues.

Said sought, and we granted, further review. He raises two issues for our review: First, whether a contract for legal services in the immigration context is the kind of special relationship in which emotional distress is foreseeable and, second, whether punitive damages were appropriate in the case. We only address those issues on further review.

## II. Scope and Standard of Review.

■■■ We review a district court's ruling on a motion for directed verdict for correction of errors of law. *Spaur v. Owens-Corning Fiberglas Corp.*, 510 N.W.2d 854, 858 (Iowa 1994); *see also* Iowa R.App. P. 6.907. We consider the evidence presented at trial in the light most favorable to the nonmoving party. *Beeman v. Manville Corp. Asbestos Disease Comp. Fund,* 496 N.W.2d 247, 254 (Iowa 1993). "Every legitimate inference that reasonably may be deduced from the evidence must be afforded the nonmoving party; and if reasonable minds can differ as to how the issue should be resolved, a jury question is engendered." *Henkel v. R & S Bottling Co.,* 323 N.W.2d 185, 187–88 (Iowa 1982).

## III. Emotional Distress Damages.

■■■ A. Introduction. The general rule in Iowa is emotional distress damages are not recoverable in torts " 'absent intentional conduct by a defendant or some physical injury to the plaintiff.' " *Clark v. Estate of Rice ex rel. Rice,* 653 N.W.2d 166, 169 (Iowa 2002) (quoting *Mills v. Guthrie Cnty. Rural Elec. Coop. Ass'n,* 454

N.W.2d 846, 852 (Iowa 1990)). This rule generally recognizes there is no duty in tort law to avoid causing emotional harm. Like most other rules, however, exceptions exist.

■■■ We recognize "a duty to exercise ordinary care to avoid causing emotional harm" when supported by the nature of the relationship between the parties and the nature of the acts engaged in by the defendant within the context of the relationship.[4] *See Oswald v. LeGrand,* 453 N.W.2d 634, 639 (Iowa 1990); *cf. Blong v. Snyder,* 361 N.W.2d 312, 316 (Iowa Ct. App.1984) ("[P]laintiff's status as an employee entitled him to more protection from insultive or abusive treatment than would be expected between two strangers."). Stated differently,

[w]e have recognized recovery for emotional distress damages in actions which did not involve an intentional tort when a party negligently performed an act which was "so coupled with matters of mental concern or solicitude, or with the sensibilities of the party to whom the duty is owed, that a breach of that duty will necessarily or reasonably result in mental anguish or suffering, and it should be known to the parties from the nature of the [obligation] that such suffering will result from its breach."

*Lawrence v. Grinde,* 534 N.W.2d 414, 420–21 (Iowa 1995) (quoting *Meyer v. Nottger,* 241 N.W.2d 911, 921 (Iowa 1976) (alteration in original)). The question we face in this case is whether this exception is applicable to the attorney-client relationship and the actions of the attorney that are claimed to be negligent. We have not yet applied the exception to a tort claim of attorney malpractice.

---

4. Another exception exists in situations in which a plaintiff personally witnesses the negligent infliction of a serious injury to a close relative. *See Barnhill v. Davis,* 300 N.W.2d 104, 108 (Iowa 1981). This exception is not at issue in this case.

**B. Development of the Law on Emotional Distress.** To better appreciate and understand the current state of our law on emotional distress damages in claims of negligence, we turn back to review the somewhat confusing development of compensation for mental distress in our law. *See* Richard B. Margulies, Note, *An Insurer Is Under an Implied–in–Law Duty of Good Faith and Fair Dealing in the Settlement of Claims by the Insured, the Breach of Which May Constitute the Element of Outrageous Conduct in a Prima Facie Case for the Tort of Intentional Infliction of Severe Emotional Distress. Amsden v. Grinnell Mutual Reinsurance Co. (Iowa 1972)*, 23 Drake L.Rev. 210, 210 (1973) [hereinafter Margulies]. On one hand, we displayed an early approval of emotional distress damages. For instance, we approved of damages awards including mental—anguish damages in a variety of intentional-tort cases, such as seduction, *Stevenson v. Belknap*, 6 Iowa 97, 6 Clarke 97, 104–05 (1858); assault and battery,[5] *McKinley v. C. & Nw. R.R.*, 44 Iowa 314, 319–22 (1876), and *Lucas v. Flinn*, 35 Iowa 9, 12–13 (1872); malicious prosecution, *Parkhurst v. Mastellar*, 57 Iowa 474, 480, 10 N.W. 864, 867 (1881); and wrongful ejection from a train, *Curtis v. Sioux City & Highland Park Ry. Co.*, 87 Iowa 622, 626–28, 54 N.W. 339, 340–41 (1893), and *Shepard v. Chi., Rock Island & Pac. Ry.*, 77 Iowa 54, 58–59, 41 N.W. 564, 565 (1889). We also permitted recovery of mental-anguish damages in a case involving the breach of a marriage contract. *See Royal v. Smith*, 40 Iowa 615, 618 (1875). In an early case, we also approved emotional distress damages in a negligence action in which the mental anguish attended a physical injury. *See Muldowney v. Ill. Cent. Ry.*, 36 Iowa 462, 468 (1873).

On the other hand, in an early case sounding in negligence, we suggested a damage award for emotional distress would be inappropriate unless accompanied by physical injury. *See Collins v. City of Council Bluffs*, 35 Iowa 432, 436 (1872). In *Collins,* we stated:

> The party injured by such a casualty should have compensation for the injury. Not such a speculative amount as would be equivalent for the bodily pain and mental anguish which the injured party has necessarily endured, but such a sum as would be an actual practical compensation for the *injury.* Physical pain and mental anguish can have no adequate compensation in dollars and cents. They are a part of the life, and "what shall a man give in exchange for his life" is an interrogative statement of its immeasurable and incomprehensible value. And, while physical and mental suffering caused by an injury are proper to be considered in determining the amount of damages, yet they are not to be compensated for in the ordinary meaning of that word, but they stand as lights around the injury, in the focal rays of which we see more intensely and clearly the full measure and extent of the injury itself.

*Id.* In tort actions grounded in negligence unaccompanied by some special relationship, this rule has persevered through time. *See Clark,* 653 N.W.2d at 170–71; *Niblo v. Parr Mfg., Inc.*, 445 N.W.2d 351, 354–55 (Iowa 1989); *Lee v. City of Bur-*

---

5. As persuasively explained by one commentator, the very existence of the intentional tort of assault presumes emotional distress and moral outrage to be compensable. *See* Calvert Magruder, *Mental and Emotional Disturbance in the Law of Torts*, 49 Harv. L.Rev. 1033, 1033–34 (1936) [hereinafter Magruder].

Indeed, in this view, emotional distress has been compensable for nearly 700 years. *See id.* at 1033 & n. 3 (citing *I de S v. W de S*, Y.B. 22 Edw. 3, fol. 99, pl. 60 (1348)). *I de S* found the defendant—an irate customer—liable for hurling a hatchet at the plaintiff innkeeper's wife.

*lington*, 113 Iowa 356, 357–58, 85 N.W. 618, 619 (1901); *Mahoney v. Dankwart*, 108 Iowa 321, 324, 79 N.W. 134, 135–36 (1899).

Iowa was not alone in the early recognition of emotional distress damages. *See, e.g., Fairchild v. Cal. Stage Co.*, 13 Cal. 599, 601 (1859); *Linsley v. Bushnell*, 15 Conn. 225, 235–36 (1842); *Lewis v. Hoover*, 3 Blackf. 407, 408 (Ind.1834); *Malone v. Murphy*, 2 Kan. 250, 261–62 (1864); *Wadsworth v. Treat*, 43 Me. 163, 167 (1857); *Canning v. Inhabitants of Williamstown*, 55 Mass. 451, 452 (1848). Yet, many courts during this time also viewed emotional distress damages as limited to certain classes of cases. As the Supreme Court of Mississippi stated,

> [d]amages for mental suffering have been very generally allowed in three classes of cases: (1) Where, by the merely negligent act of the defendant, physical injury has been sustained; and in this class of cases they are compensatory, and the reason given for their allowance by all the courts is that the one cannot be separated from the other. (2) In actions for breach of contract of marriage. (3) In cases of willful wrong, especially those affecting the liberty, character, reputation, personal security, or domestic relations of the injured party.

*W. Union Tel. Co. v. Rogers*, 68 Miss. 748, 9 So. 823, 825 (1891). Stated in the inverse, some courts viewed awards of emotional distress damages as the exception and not the rule. *See Gatzow v. Buening*, 106 Wis. 1, 81 N.W. 1003, 1009 (1900). Lord Wensleydale famously captured the prevailing rule when he wrote, "Mental pain or anxiety the law cannot value, and does not pretend to redress, when the unlawful act complained of causes that alone[.]" *Lynch v. Knight*, (1861) 11 Eng. Rep. 854 (H.L.) 863; 9 H.L. Cas. 577, 598.

A significant early limitation on the award of emotional distress damages in Iowa can be observed in our refusal to award emotional distress damages in a breach-of-contract action. *See Stone v. Chi. & Nw. R.R.*, 47 Iowa 82, 88 (1877). This limitation in contracts actions has influenced the development of emotional distress damages in negligence actions because the two actions were often joined together. In *Stone*, we said:

> The damages that may be recovered in actions on contracts are tested and governed by entirely different rules from actions on torts. In the former, the damages must be such as fairly and naturally result from the breach of the contract. Insult and abuse accompanying a breach cannot affect the amount of the recovery in such actions. If the action is based on a wrong the jury are permitted to consider injury to feelings and many other matters which have no place in actions to recover damages for a breach of contract.

*Id.* Yet, this limitation was not absolute, as revealed in our cases dealing with marriage contracts. *See Royal*, 40 Iowa at 618. Moreover, less than twenty years after *Stone*, we opined damages might be available for emotional distress under some more conventional contracts. *See Mentzer v. W. Union Tel. Co.*, 93 Iowa 752, 753, 760–61, 62 N.W. 1, 1, 4 (1895).

Over time, we have backed away from our statement in *Stone*, as the gradual evolution of our general rules of contract have seemed to support expanding the types of damages available in certain breaches of contracts. This evolution actually began with the seminal case of *Hadley v. Baxendale*, (1854) 156 Eng. Rep. 145, 151; 9 Exch. 341, 354. In *Hadley*, the court famously said:

> Where two parties have made a contract which one of them has broken, the dam-

ages which the other party ought to receive in respect of such breach of contract should be such as may fully and reasonably be considered either as arising naturally, i.e., according to the usual course of things, from such breach of contract itself, or such as may reasonably be supposed to have been in the contemplation of both parties at the time they made the contract, as the probable result of the breach of it. Now, if the special circumstances under which the contract was actually made were communicated by the plaintiffs to the defendants, and thus known to both parties, the damages resulting from the breach of such a contract, which they would reasonably contemplate, would be the amount of injury which would ordinarily follow from a breach of contract under these special circumstances so known and communicated.

*Id.* at 344.

In this manner, some commentators now recognize *Hadley* to be the first step to making the law of contracts more like the law of torts. *See* Alexander J. Bolla Jr., *Contort: New Protector of Emotional Well–Being in Contract?*, 19 Wake Forest L.Rev. 561, 561 (1983) [hereinafter Bolla]. After all, as we have previously recognized, *Hadley* essentially looks to what the parties to the contract actually knew and contemplated or *reasonably should have known and contemplated. See DeWaay v.*

*Muhr,* 160 N.W.2d 454, 459 (Iowa 1968). While *Hadley* may be viewed as articulating two rules, the difference between its two statements is illusory; parties reasonably should contemplate the natural and probable consequences of a breach of contract. *See id.*

The progression of contract law to resemble portions of tort law has been understandable. After all, modern contract law owes a debt of existence to tort law. As pointed out by Professor Ames, the writ of assumpsit[6]—a forerunner of modern contract actions—derives from the common law tort of trespass on the case.[7] *See* James Barr Ames, *The History of Assumpsit,* 2 Harv. L.Rev. 1, 2 (1888). Indeed, the earliest assumpsit cases resemble modern negligence cases, particularly cases of the malpractice variety. *Id.* But, liability in these cases—a barber who negligently shaved a man's face, a veterinarian who negligently shoed a horse, a ferryman who negligently overloaded a boat, a carpenter who negligently constructed a building—was grounded not on the tortious nature of the conduct, but rather the defendant's promise to undertake the labor skillfully. *See id.* at 2, 4. Over time, the cause of action focused more and more on the promise and less on the tortious nature of the actions. *See id.* at 9–15. Eventually, assumpsit became what is now essentially the action for a breach of contract. *See id.* at 15–16.

---

**6.** Assumpsit—Latin for "he undertook"—is both "[a]n express or implied promise, not under seal, by which one person undertakes to do some act or pay something to another" and "[a] common-law action for breach of such a promise or for breach of a contract." *Black's Law Dictionary* 142 (9th ed.2009).

**7.** "Trespass on the case" was "[a]t common law, an action to recover damages that are not the immediate result of a wrongful act but rather a later consequence." *Black's Law Dictionary* 1643 (9th ed.2009). Trespass on

the case is often credited as the theoretical progenitor of negligence. *See, e.g.,* Charles O. Gregory, *Trespass to Negligence to Absolute Liability*, 37 Va. L.Rev. 359, 363 (1951) ("In actions on the case for inadvertently caused harm to person or property, this new item of illegality or fault became what we now speak of as negligence."); *see also* Oliver Wendell Holmes, Jr., *The Common Law* 80–81, 88–89, 92–107 (Dover Publ'n 1991) (1881) (describing the evolution of civil liability sounding in tort).

Modern contract law's origin in assumpsit and trespass on the case makes the award of tort-like damages in breach-of-contract cases more reasonable. *See Meyer*, 241 N.W.2d at 920–21 ("Where one holds himself out as specially qualified to perform the services incident to a funeral and burial, unless there is express contrary agreement, it is implied in a contract for such services that such person will exercise proper skill and perform the contract obligations in a workmanlike manner."). We find the ancient interrelation of torts and contracts helpful in the outcome of the instant case.

■ Therefore, we can draw an important lesson for modern contractual relationships from *Hadley*. The lesson, which is implicit in the *Lawrence* rule, teaches that when parties to a transaction should reasonably have contemplated that emotional distress will naturally flow from a breach of the contract, the foreseeable consequential damages the plaintiff could recover should include damages for emotional distress.

However, an important limitation on this development is that not all contracts are created equal. To be clear, the inquiry under *Lawrence* is not simply whether the parties contemplated emotional distress as a result of a breach during the negotiation and formation of the contract, but whether the subject matter underlying the contractual arrangement was one in which emotional distress was a "particularly likely result." *See* Restatement (Second) of Contracts § 353 cmt. *a*, at 149 (1981); *see also Mentzer*, 93 Iowa at 761, 62 N.W. at 3 (considering "the subject matter of the contract" important); *Sullivan v. O'Connor*, 363 Mass. 579, 296 N.E.2d 183, 188–89 (1973) ("It is all a question of the subject matter and background of the contract, and when the contract calls for an operation on the person of the plaintiff, psycho-

logical as well as physical injury may be expected to figure somewhere in the recovery, depending on the particular circumstances."); Bolla, 19 Wake Forest L.Rev. at 565 ("Thus far, the most critical element of the contort recovery has involved the subject matter of the contract and the attendant special relationship between the promisor and promisee.").

The Restatement rule is similar: "Recovery for emotional disturbance will be excluded unless the breach also caused bodily harm or the contract or the breach is of such a kind that serious emotional disturbance was a particularly likely result." Restatement (Second) of Contracts § 353, at 149. Notably, the comment to section 353 distinguishes between situations in which the subject matter underlying the contract renders emotional distress damages unavailable "[e]ven if they are foreseeable" and cases in which emotional distress damages are available because the subject matter "is of such a kind that serious emotional disturbance was a particularly likely result." *Id.* § 353 cmt. *a*, at 149. For example,

A contracts to construct a house for B. A knows when the contract is made that B is in delicate health and that proper completion of the work is of great importance to him. Because of delays and departures from specifications, B suffers nervousness and emotional distress. In an action by B against A for breach of contract, the element of emotional disturbance will not be included as loss for which damages may be awarded.

*Id.* § 353 cmt. *a* illus. 1, at 149. But,

A makes a contract with B to conduct the funeral for B's husband and to provide a suitable casket and vault for his burial. Shortly thereafter, B discovers that, because A knowingly failed to provide a vault with a suitable lock, water has entered it and reinterment is neces-

sary. B suffers shock, anguish and illness as a result. In an action by B against A for breach of contract, the element of emotional disturbance will be included as loss for which damages may be awarded.

*Id.* § 353 cmt. *a* illus. 3, at 150.

Therefore, on the one hand, emotional distress is not a "particularly likely result" or a natural and probable consequence of some ordinary commercial and insurance contracts.[8] *See Clark–Peterson Co. v. Indep. Ins. Assocs., Ltd.,* 514 N.W.2d 912, 916 (Iowa 1994) (holding emotional distress damages were not available in the context of denial of insurance payments); *Bossuyt,* 360 N.W.2d at 776–77 (holding emotional distress damages were not available in the context of collection of a cashier's check); *Smith v. Sanborn State Bank,* 147 Iowa 640, 644, 126 N.W. 779, 781 (1910) ("[N]o

case has been called to our attention, nor do we think one can be found, which holds that damages are recoverable for mental anguish growing out of the violation of a contract for the payment of money."). *But see Westesen v. Olathe State Bank,* 78 Colo. 217, 240 P. 689, 690–91 (1925) (permitting recovery of emotional distress damages against a bank that failed to honor promissory notes issued to plaintiff who then traveled to California).

■ On the other hand,

"[w]here the contract is personal in nature and the contractual duty or obligation is so coupled with matters of mental concern or solicitude, or with the sensibilities of the party to whom the duty is owed, that a breach of that duty will necessarily or reasonably result in mental anguish or suffering, and it

---

**8.** We also observe that some commercial breach-of-contract plaintiffs have attempted to graft an intentional-infliction-of-emotional distress claim onto what is otherwise a bare breach-of-contract claim. *See, e.g., Bossuyt v. Osage Farmers Nat'l Bank,* 360 N.W.2d 769, 776–77 (Iowa 1985); *Harsha v. State Sav. Bank,* 346 N.W.2d 791, 800–01 (Iowa 1984); *Poulsen v. Russell,* 300 N.W.2d 289, 296–99 (Iowa 1981). We held these plaintiffs did not offer sufficient evidence of severe emotional distress. *See Bossuyt,* 360 N.W.2d at 777; *Harsha,* 346 N.W.2d at 801; *Poulsen,* 300 N.W.2d at 297. That the breach was apparently deliberate did not change the analysis. *See, e.g., Harsha,* 346 N.W.2d at 801 (discussing defendant's allegedly deliberate breach of the contract and holding jury should not have been permitted to consider emotional distress damages); *cf. White v. Nw. Bell Tel. Co.,* 514 N.W.2d 70, 77 (Iowa 1994) ("Generally a breach of contract, even if intentional, will be insufficient to support a punitive damage award.").

This is not to say that breach or threatened breach of an insurance contract or other commercial contract will not constitute intentional infliction of emotional distress. *See Amsden v. Grinnell Mut. Reins. Co.,* 203 N.W.2d 252, 254–55 (Iowa 1972). In *Amsden,* we observed that an insurance company that maliciously threatens to withhold payments violates the duty of good faith and fair dealing, and " 'violation of that duty sounds in tort notwithstanding that it may also constitute a breach of contract.' " *Id.* at 254 (quoting *Fletcher v. W. Nat'l Life Ins. Co.,* 10 Cal. App.3d 376, 89 Cal.Rptr. 78, 93 (1970)). Although we did not consider the conduct of the insurance company in *Amsden* extreme or outrageous, we suggested breach of a contractual duty might otherwise be a sufficient basis for awarding damages for emotional distress. *See id.* at 255.

Other courts have also permitted recovery of damages for intentional infliction of emotional distress in the context of a claim of breach of the duty of good faith and fair dealing. *See, e.g., Goodson v. Am. Standard Ins. Co. of Wis.,* 89 P.3d 409, 417 (Colo.2004); *State Farm Mut. Auto. Ins. Co. v. Shrader,* 882 P.2d 813, 833 (Wyo.1994). At least one court has held the breaching party liable for intentional infliction of emotional distress outside the context of the duty of good faith and fair dealing. *See Simon v. Solomon,* 385 Mass. 91, 431 N.E.2d 556, 562 (1982) (holding landlord could be held liable for tenant's emotional distress damages for reckless infliction of emotional distress in the course of the landlord's breach of the warranty of habitability).

should be known to the parties from the nature of the contract that such suffering will result from its breach, compensatory damages therefor may be recovered. In such case the party sought to be charged is presumed to have contracted with reference to the payment of damages of that character in the event such damages should accrue on account of his breach of the contract."

*Meyer*, 241 N.W.2d at 921 (quoting *Lamm v. Shingleton*, 231 N.C. 10, 55 S.E.2d 810, 813 (1949)). This notion is already reflected from the general standard of care for professionals who hold themselves out as specialists—these specialists understand that certain types of harm will naturally befall their customers if they breach the contract. *Id.* at 920–21.

As the *Lamm* court explained, emotional distress damages can be impliedly contemplated by the terms of a contract dealing with personal or sensitive subject matter. *See* 55 S.E.2d at 813–14. As stated in the context of a contract to provide funeral home services,

> [w]hen the defendants contracted with plaintiff to inter the body of her deceased husband in a workmanlike manner they do so with the knowledge that she was the widow and would naturally and probably suffer mental anguish if they failed to fulfill their contractual obligation in the manner here charged. The contract was predominately personal in nature and no substantial pecuniary loss would follow its breach. Her mental concern, her sensibilities, and her solicitude were the prime considerations for the contract, and the contract itself was such as to put the defendants on notice that a failure on their part to inter the body properly would probably produce mental suffering on her part. It cannot be said, therefore, that such damages were not within the contempla-

tion of the parties at the time the contract was made.

*Id.*

We recognized these same considerations when we began to observe the link between contracts and emotional damages over a century ago. In *Mentzer*, we permitted an award of emotional distress damages surrounding the negligent failure to deliver a telegram concerning the death of the recipient's mother in time for the recipient to attend her funeral. 93 Iowa at 770–71, 62 N.W. at 6. Because the jury found the defendant liable under both a tort and contract, we analyzed the availability of emotional distress damages under both theories. *See id.* at 759–67, 62 N.W. at 3–5.

We discussed the damages contemplated by the contract. *See id.* at 761–62, 62 N.W. at 4. We noted the transmission of information regarding the death of a loved one is sensitive, and if a person does not learn of the funeral in time to attend because of a failure to transmit the information, the person "naturally and almost inevitably suffers mental pain and anguish." *Id.* at 761, 62 N.W. at 4. Emphasizing that the defendant telegraph company was aware of the nature of information at issue and its time sensitivity, we relied on *Hadley* and opined the defendant reasonably should have contemplated the probability of emotional distress. *See id.* at 760–61, 62 N.W. at 3–4.

We noted a "general rule" prohibiting damages for mental suffering for breach of "ordinary contracts." *Id.* at 761, 62 N.W. at 4. The general rule we observed dated to the common law. *Id.* But, we did not find the common law dispositive:

> [I]t must be remembered that this rule grew up at a time when there was no thought of the transmission of intelligence by electricity. Breaches of contract, such as the one in question, were

unknown to the common law. The business of telegraphy has grown up within comparatively recent years. But must we say that the law furnishes no remedy because no case of the kind was known to the common law? If so, such law is no longer applicable to our present conditions.

*Id.* After all, we acknowledged at the outset of the opinion that the law of the past must sometimes yield to the changed circumstances and increased understanding of the present. *Id.* at 757, 62 N.W. at 2.

One of the crowning glories of the common law has been its elasticity, and its adaptability to new conditions and new states of fact. It has grown with civilization, and kept pace with the march of events, so that it is as virile to-day, in our advanced state of civilization, as it was when the race was emerging from the dark ages of the past. Should it ever fail to be adjustable to the new conditions which age and experience bring, then its usefulness is over, and a new social compact must be entered into.

*Id.*

Focusing on the facts of the case at hand, we explained that the subject matter of the contract was important:

Regard must be had, too, to the subject-matter of the contract. The message does not relate to property. In such cases for breach of contract the law affords adequate compensation. But it does relate to the feelings, the sensibilities, aye, sometimes even to the life, of the individual. It does not affect his pocketbook seriously, but it does relate to his feelings, his emotions, his sensibilities,—those finer qualities which go to make the man. Shall we say that in one case the law affords compensation, and in the other it does not? Instead of goods which are conveyed by the defendant, it is intelligence,—thought. If defendant were a common carrier of goods, it would be liable for all damages sustained by reason of its breach of contract to deliver them within a reasonable time. But it is said no damages can be recovered for failure to deliver intelligence, beyond the amount actually paid for the message, or nominal damages, although the addressee may endure the greatest of mental pangs, notwithstanding the fact that such suffering was in the contemplation of the parties at the time the contract was made. Of course, every breach of contract is likely to cause some pain, but most of these contracts relate to property and pecuniary matters, and in such case the law furnishes what has always been held to be an adequate remedy for the pecuniary loss sustained.

*Id.* at 761–62, 62 N.W. at 4. We added that while mental anguish is rarely contemplated explicitly in many contracts, courts uniformly allowed recovery of emotional distress damages for breaches of marriage. *Id.* at 762–63, 62 N.W. at 4; *see also Royal,* 40 Iowa at 618. Quoting another telegraph case, we clarified that when a contract contemplates a different kind of benefit between the parties, a different measure of damages ought to be allowed:

"These illustrations serve the purpose of showing that in the ordinary contract only pecuniary benefits are contemplated by the contracting parties, and that, therefore, the damages resulting from such breach of contract must be measured by pecuniary standards, and that, where other than pecuniary benefits are contracted for, other than pecuniary standards should be applied in the ascertainment of damages flowing from the breach."

*Mentzer,* 93 Iowa at 763, 62 N.W. at 4 (quoting *Wadsworth v. W. Union Tel. Co.,* 86 Tenn. 695, 8 S.W. 574, 576–77 (1888)).

*Mentzer,* of course, was a case involving negligent failure to deliver information via telegraph. *Id.* at 753, 62 N.W. at 1. Information regarding business transactions could surely have been transmitted by telegraph, but under *Mentzer,* the negligent failure to transmit pecuniary information would not necessarily expose the telegraph company to emotional distress damages. *See id.* at 770, 62 N.W. at 7. Thus, the basis for an award of emotional distress damages came from the specific contract to deliver sensitive, intimate information regarding the death of the plaintiff's mother, not the general type of contract itself. *See id.*

After *Mentzer,* we affirmed its holding when presented with similar facts. *See Bernstein v. W. Union Tel. Co.,* 169 Iowa 115, 129, 151 N.W. 108, 112 (1915); *Cowan v. W. Union Tel. Co.,* 122 Iowa 379, 381, 98 N.W. 281, 281 (1904). However, we backed away from its reasoning somewhat as we marched through the twentieth century. *See Wambsgans v. Price,* 274 N.W.2d 362, 365–66 (Iowa 1979); *Frederick v. W. Union Tel. Co.,* 189 Iowa 1338, 1342–43, 179 N.W. 934, 936–37 (1920); *Sanborn State Bank,* 147 Iowa at 643–44, 126 N.W. at 780–81. We did this largely by distinguishing *Mentzer. See, e.g., Fred-*

*erick,* 189 Iowa at 1342–43, 179 N.W. at 936–37 (refusing to permit an award of emotional distress damages based on negligent failure to transmit an interstate telegraph message). For example, in *Sanborn State Bank,* we distinguished *Mentzer,* and many of the cases it relied on, as being a "class of contracts upon breach of which the injured party may, if he so elect, bring an action sounding in tort." 147 Iowa at 643, 126 N.W. at 780. Furthermore, emotional distress unconnected to physical injury was often referred to as "fright" throughout the twentieth century. *E.g., Blakeley v. Shortal's Estate,* 236 Iowa 787, 791, 20 N.W.2d 28, 31 (1945); *Holdorf v. Holdorf,* 185 Iowa 838, 841, 169 N.W. 737, 738 (1918); *Lee,* 113 Iowa at 357, 85 N.W. at 619. For much of the middle of the twentieth century, different attitudes emerged regarding emotional distress, and a different rule generally prevailed.[9] This midcentury approach became the foundation for our "general rule" today.

Of course, *Meyer* revived *Mentzer* nearly forty years ago in the context of negligent preparations in a contract for funeral services. *See Meyer,* 241 N.W.2d at 920. Since that time, we have gradually become more permissive of claims for emotional distress. In 1981, five years after *Meyer,* we recognized a claim for negligent infliction of emotional distress connected to witnessing a serious injury to a family mem-

---

**9.** This trend in emotional distress damages is also exemplified by the stature in Iowa of the tort of intentional infliction of emotional harm during the middle of the twentieth century. *Compare Curnett v. Wolf,* 244 Iowa 683, 687–88, 57 N.W.2d 915, 918 (1953) (noting "[t]he Iowa authorities . . . are not entirely uniform" and citing Restatement of Torts § 46 (1948) before holding plaintiff may make intentional infliction-of-emotional distress claim), *and Barnett v. Collection Serv. Co.,* 214 Iowa 1303, 1312, 242 N.W. 25, 28 (1932) (holding plaintiff may recover damages for mental anguish from a creditor who mali-

ciously sought to inflict mental pain), *with Wambsgans,* 274 N.W.2d at 365 (characterizing a claim of intentional infliction of mental distress as a "relatively new tort concept" and citing *Amsden), and Amsden,* 203 N.W.2d at 254–55 (adopting a California court's statement regarding the elements of the tort of intentional infliction of severe emotional distress without any discussion of Iowa precedent); *see also* Margulies, 23 Drake L.Rev. at 213–14 (declining to opine why the *Amsden* court referred to out-of-state courts and not existing Iowa precedent).

ber. *Barnhill v. Davis,* 300 N.W.2d 104, 108 (Iowa 1981). Five years later, we interpreted the phrase "actual damages" in the Iowa Civil Rights Act to permit emotional distress damages. *See Chauffeurs, Teamsters & Helpers, Local Union No. 238 v. Iowa Civil Rights Comm'n,* 394 N.W.2d 375, 382–83 (Iowa 1986). Four years later, we permitted emotional distress damages in a case alleging tortious breach of a contract for delivery of medical services surrounding negligent delivery of a child. *See Oswald,* 453 N.W.2d at 639. In 1995, five years later, we cited *Oswald* and *Meyer* in *Lawrence* and suggested certain legal malpractice actions might support a claim for emotional distress damages. *See Lawrence,* 534 N.W.2d at 421–22. These cases are the foundation for the exceptions to the general rule. Thus, we have identified a growing list of negligence actions that could support a claim for emotional damages.

During this progression, the focus in *Mentzer* on the underlying subject matter of the contract has persisted in our modern jurisprudence involving emotional distress awards under contracts.[10] *See Lawrence,* 534 N.W.2d at 420–21; *Oswald,* 453 N.W.2d at 639; *Niblo,* 445 N.W.2d at 355; *Meyer,* 241 N.W.2d at 920–21. Other courts have similarly considered whether the nature of the interest invaded was pecuniary or personal. *See, e.g., F. Becker Asphaltum Roofing Co. v. Murphy,* 224 Ala. 655, 141 So. 630, 631 (1932); *Holliday v. Jones,* 215 Cal.App.3d 102, 264 Cal.Rptr.

448, 455–56 (1989); *Sullivan,* 296 N.E.2d at 188–89; *Burrus v. Nev.–Cal.–Or. Ry.,* 38 Nev. 156, 145 P. 926, 928–29 (1915); *Hilt v. Bernstein,* 75 Or.App. 502, 707 P.2d 88, 95–96 (1985). For instance, regarding "contracts entered into for the accomplishment of a commercial purpose," the Supreme Court of Michigan wrote:

> Pecuniary interests are paramount. In such cases breach of contract may cause worry and anxiety varying in degree and kind from contract to contract, depending upon the urgencies thereof, the state of mind of the contracting parties, and other elements, but it has long been settled that recovery therefor was not contemplated by the parties as the 'natural and probable' result of the breach.

*Stewart v. Rudner,* 349 Mich. 459, 84 N.W.2d 816, 823 (1957). But, nonpecuniary contracts do exist:

> Yet not all contracts are purely commercial in their nature. Some involve rights we cherish, dignities we respect, emotions recognized by all as both sacred and personal. In such cases the award of damages for mental distress and suffering is a commonplace, even in actions *ex contractu.*

*Id.*

*Mentzer,* and cases like it, are important to this case because legal malpractice actions sound in tort, yet owe their existence in part to contract law.[11] *See* 4 Dan B.

---

**10.** The common law, not unlike times and attitudes, changes. Because, as we explain below, we hold Klever and Nancy's claim prevails under existing law, we do not need to inquire whether to take the further step to permit an award of emotional distress damages in every case in which a legally cognizable right has been invaded or a legal duty breached and "to abandon [the] artificial devices [prohibiting awards of emotional distress damages] ... and to rely upon the trial process for protection against fraudulent

claims." *Gammon v. Osteopathic Hosp. of Me., Inc.,* 534 A.2d 1282, 1285 (Me.1987).

**11.** Cases involving contracts for services other than legal representation are also influential on our decision because we recognize that "[a]s with legal malpractice liability in general, the courts have been slow to expose lawyers to liability for noneconomic elements of damages caused to their clients by malpractice." *See* John H. Bauman, *Damages for Legal Malpractice: An Appraisal of the Crumbling Dike and the Threatening Flood,* 61 Tem-

Dobbs, Paul T. Hayden & Ellen M. Bublick, *The Law of Torts* § 718, at 2 (2d ed.2011) [hereinafter Dobbs] ("Legal malpractice ... entails breach of a duty created by the contract or by the relationship with the client. Indeed, in some cases the claim may be brought as a contract claim as well as a negligence claim....") (Footnote omitted.)); *see also Trobaugh v. Sondag*, 668 N.W.2d 577, 580 n. 1 (Iowa 2003) (identifying among the elements of a claim for legal malpractice " 'the existence of an attorney–client relationship giving rise to a duty' " (quoting *Ruden v. Jenk*, 543 N.W.2d 605, 610 (Iowa 1996))); *Thomas v. Schee*, 80 Iowa 237, 241, 45 N.W. 539, 540 (1890) (recognizing an attorney's employment contract confers a duty of reasonable care). Moreover, the test quoted in *Lawrence* for determining whether emotional distress damages should be available comes from a discussion of contract law. *See Lawrence*, 534 N.W.2d at 420–21 (discussing *Meyer*, 241 N.W.2d at 920–21).

Turning more to the cause of action in this case, we have thus far refrained from actually holding emotional distress damages may be awarded for legal malpractice. *See id.* at 423. In *Lawrence*, a plaintiff brought a legal malpractice action against his attorney in a bankruptcy action who negligently failed to disclose in the bankruptcy questionnaire and schedules a settlement that the plaintiff had entered into with a business associate within a year prior to the bankruptcy. *Id.* at 416. When the federal government subsequent-ly learned of the settlement, the plaintiff was indicted for bankruptcy fraud. *Id.* at 417. After the federal court found plaintiff not guilty of bankruptcy fraud, he sued his attorney, seeking both economic loss damages and emotional distress damages. *Id.*

We held emotional distress damages were not available. *Id.* at 423. We noted that a close reading of those cases revealed that emotional distress damages are available only "in situations which involve both a close nexus to the action at issue and extremely emotional circumstances." *Id.* at 421. We expanded on this thought, stating, "Damages for emotional distress which arise out of acts which invade an interest protected by tort law are recoverable only if the claimed emotional distress 'naturally ensues from the acts complained of.' " *Id.* at 422 (quoting *Merenda v. Super. Ct.*, 3 Cal.App.4th 1, 4 Cal.Rptr.2d 87, 89 (1992), *disapproved of in part by Ferguson v. Lieff, Cabraser, Heimann & Bernstein*, 69 P.3d 965, 974 (Cal.2003)). We noted that most courts do not consider emotional distress as reasonably foreseeable in most legal malpractice cases. *See id.* (collecting cases). Nonetheless, we observed, "in 'special cases involving peculiarly personal subject matters' do the majority of jurisdictions recognize that mental anguish may be a foreseeable damage resulting from attorney negligence." *Id.* (quoting *Selsnick v. Horton*, 96 Nev. 944, 620 P.2d 1256, 1257 (1980)).

ple L.Rev. 1127, 1163 (1988). We are wary of "creat[ing] a special rule benefitting only negligent lawyers." *Holliday*, 215 Cal.App.3d at 114, 264 Cal.Rptr. at 455. Indeed, as the California Court of Appeal explained,

> [i]f as a result of improper psychiatric diagnosis an individual is mistakenly committed to a mental hospital, *Molien* [*v. Kaiser Foundation Hospitals*, 27 Cal.3d 916, 167 Cal.Rptr. 831, 616 P.2d 813, 821 (1980)]

plainly allows recovery of emotional distress damages against the negligent psychiatrist. If the same individual is mistakenly committed as a result of the negligence of his lawyer and suffers the same damages, defendants' argument would require that recovery be denied. In our view, not only is such a special interest rule unfair, but public perceptions regarding it poorly serve the broader interests of the legal profession. *Id.*

Ultimately, emotional distress damages were unavailable because Lawrence's claimed emotional distress was "one step removed" from the attorney's negligence. *Id.* "Were it not for the indictment by the federal government for fraud, there would have been no basis for Lawrence's claim." *Id.* Confining our holding to bankruptcy attorneys, we concluded that negligent management of the bankruptcy process "is not ' "so coupled with matters of mental concern or solicitude, or with the feelings of the party to whom the duty is owed, that a breach of that duty will necessarily or reasonably result in mental anguish or suffering." ' " *Id.* at 423 (quoting *Oswald,* 453 N.W.2d at 639).

The *Lawrence* majority drew a dissent from Justice Carter. Justice Carter disagreed slightly with the legal framework, arguing the physical injury requirement is justified for certain reasons; and in situations in which the reasons underlying the rule do not apply, the rule should not either. *Id.* at 423–24 (Carter, J., dissenting). The primary focus of Justice Carter's dissent was a pointed disagreement with the conclusion the majority reached. Justice Carter wrote:

> Lawyers are hired for the very purpose of assisting their clients in avoiding the harsh consequences, including emotional consequences, that frequently attend a failure to observe legal requirements. In the present case, the jury could have found that the defendant's negligent actions in filling out bankruptcy schedules made it appear that the client had committed a serious federal crime. This in turn led to indictment, arrest and trial with the possibility of conviction and imprisonment—circumstances that by their very nature placed the client in a very stressful situation that continued over a lengthy period of time. The severe emotional impact that this would place on any normal person is

neither trivial nor speculative. It would not, however, ordinarily produce a physical injury so as to be compensable under the general rule.

> The present case meets both the "special relation of the actor" test applied in *Oswald* and the "unlikely occurrence of physical injury in connection with foreseeable emotional distress" test invoked in the *Mentzer* telegram case. The reasons for the general rule of nonliability advanced in section 436A of the Restatement do not fit the present controversy. The anxiety that would normally accompany the travail of being indicted, arrested, and tried for a serious federal crime is not in the realm of the trivial. A person subjected to those occurrences will not be subject to feigning emotional distress. These circumstances create a strong likelihood that such distress will occur and will exist throughout the entire period of the criminal proceeding.

*Id.* at 424. If nothing else, the contrast between the majority and dissenting opinions revealed that the line between an award for emotional damages in legal malpractice was not sharply defined.

Other courts have arrived at the same result as the *Lawrence* majority in cases in which the attorney is retained for solely economic reasons. *See, e.g., Boros v. Baxley,* 621 So.2d 240, 244–45 (Ala.1993); *Reed v. Mitchell & Timbanard, P.C.,* 183 Ariz. 313, 903 P.2d 621, 627 (Ct.App.1995); *Quezada v. Hart,* 67 Cal.App.3d 754, 136 Cal. Rptr. 815, 820 (1977), *disapproved of by Pleasant v. Celli,* 18 Cal.App.4th 841, 22 Cal.Rptr.2d 663, 669 (1993); *Aller v. Law Office of Carole C. Schriefer, PC,* 140 P.3d 23, 26–27 (Colo.App.2005); *McClain v. Faraone,* 369 A.2d 1090, 1094 (Del.Super.Ct.1977); *Maere v. Churchill,* 116 Ill. App.3d 939, 72 Ill.Dec. 441, 452 N.E.2d 694, 697–98 (1983); *Richards v. Cousins,*

550 So.2d 1273, 1278 (La.Ct.App.1989); *Garland v. Roy*, 976 A.2d 940, 948 (Me. 2009); *Selsnick*, 620 P.2d at 1257; *Gautam v. De Luca*, 215 N.J.Super. 388, 521 A.2d 1343, 1348–49 (1987); *Carroll v. Rountree*, 34 N.C.App. 167, 237 S.E.2d 566, 571–72 (1977); *Hilt*, 707 P.2d at 95; *Douglas v. Delp*, 987 S.W.2d 879, 885 (Tex.1999); *Vincent v. DeVries*, —— Vt. ——, 72 A.3d 886, 897 (2013) (holding that threatened loss of plaintiff's home due to attorney's negligence did not support a claim for emotional distress damages).[12]

Yet, we observe other courts have permitted awards of emotional distress damages when emotional distress is a natural and foreseeable consequence of a breach of contract or attorney malpractice. *See, e.g., Wagenmann v. Adams*, 829 F.2d 196, 221–22 (1st Cir.1987) (applying Massachusetts law) (holding emotional distress damages are available when attorney negligence results in the client being "forcibly deprived of his liberty and dispatched to a mental hospital"); *Holliday*, 264 Cal.Rptr. at 455–56 (holding emotional distress damages were appropriate when plaintiff had been wrongfully convicted of manslaughter because of his trial attorney's negligence); *Person v. Behnke*, 242 Ill.App.3d 933, 183 Ill.Dec. 702, 611 N.E.2d 1350, 1353 (1993) ("We hold that a valid claim exists for noneconomic damages resulting from a plaintiff's loss of custody and visitation of his children which allegedly resulted from an attorney's negligence."); *Henderson v. Domingue*, 626 So.2d 555, 559 (La.Ct.App. 1993); *Kohn v. Schiappa*, 281 N.J.Super. 235, 656 A.2d 1322, 1324 (1995); *McEvoy v. Helikson*, 277 Or. 781, 562 P.2d 540, 542, 544 (1977) (holding plaintiff could obtain emotional distress damages when attorney negligence surrounding divorce and child custody proceedings resulted in plaintiff's

---

12. We also note that some courts appear to take a more categorical approach. Some of these courts permit awards of emotional distress damages in legal malpractice actions without regard to subject matter of the underlying representation. *See, e.g., Beis v. Bowers*, 649 So.2d 1094, 1096–97 (La.Ct.App.1995); *Salley v. Childs*, 541 A.2d 1297, 1300 (Me. 1988); *Gore v. Rains & Block*, 189 Mich.App. 729, 473 N.W.2d 813, 819 (1991). A difficulty in evaluating some of these cases is that conflicting authority exists in these jurisdictions. *See Richards*, 550 So.2d at 1278; *Garland*, 976 A.2d at 948. Thus, these opinions may be less categorical than they appear. At least one state appears to have resisted the award of emotional distress damages in all circumstances. *See Kaiser v. Van Houten*, 12 A.D.3d 1012, 785 N.Y.S.2d 569, 572–73 (2004); *Epifano v. Schwartz*, 279 A.D.2d 501, 719 N.Y.S.2d 268, 270 (2001); *Wolkstein v. Morgenstern*, 275 A.D.2d 635, 713 N.Y.S.2d 171, 172–73 (2000); *Taylor v. Paskoff & Tamber, LLP*, 29 Misc.3d 1125, 908 N.Y.S.2d 861, 862–63 (2010). The rule followed by New York courts differs significantly from our own.

We note that other courts will permit awards of emotional distress damages in legal malpractice actions when the conduct is willful or wanton, but do not appear to inquire into the subject matter of the underlying contract. *See, e.g., Timms v. Rosenblum*, 713 F.Supp. 948, 954–55 (E.D.Va.1989) (holding plaintiff was not entitled to emotional distress damages when defendant had not acted intentionally or recklessly); *Hamilton v. Powell, Goldstein, Frazer & Murphy*, 167 Ga.App. 411, 306 S.E.2d 340, 344 (1983); *Lickteig v. Alderson, Ondov, Leonard & Sween, P.A.*, 556 N.W.2d 557, 560–62 (Minn.1996) (holding emotional distress damages are recoverable in the context of legal malpractice involving pecuniary matters when the attorney's behavior satisfies a heightened culpability standard); *Long-Russell v. Hampe*, 39 P.3d 1015, 1018 (Wyo.2002) (adopting *Lickteig*); *see also Bowman v. Doherty*, 235 Kan. 870, 686 P.2d 112, 117–18 (1984) (applying a similar rule in the context of deprivations of civil rights). While a reasonable jury could find that Said's conduct was willful or wanton, we need not consider this line of authority because Klever and Nancy were entitled to present a claim for emotional distress damages to the jury under the reasoning announced in *Lawrence*.

ex-wife fleeing to Switzerland with their child), *superseded by rule on* other grounds as stated in *Moore v. Willis*, 307 Or. 254, 767 P.2d 62, 64 (1988); *see also Hilt*, 707 P.2d at 96 (stressing that the interest invaded in that case was an economic one and that plaintiff could recoup that interest through ordinary compensatory damages); D. Dusty Rhoades & Laura W. Morgan, *Recovery for Emotional Distress Damages in Attorney Malpractice Actions*, 45 S.C. L.Rev. 837, 845 (1994) ("When an attorney's negligence causes a client's loss of liberty, courts have been willing to step away from the general rule barring damages for emotional distress.").

■ As with the recovery of emotional distress damages in breach-of-contract actions generally, the rule appears to ask courts to consider the underlying interest invaded by the attorney's negligence. *See Lawson v. Nugent*, 702 F.Supp. 91, 95 (D.N.J.1988) (holding plaintiff was allowed to offer proof of emotional distress in a legal malpractice action alleging plaintiff spent twenty extra months in maximum security prison because of his attorney's negligence); *Hilt*, 707 P.2d at 96 (distinguishing cases based on the underlying interests invaded, such as the right to a parent–child relationship or the right to have the deceased's remains left undisturbed, rather than the interest in receiving competent legal services); *see also* Joseph J. Kelleher, *An Attorney's Liability for the Negligent Infliction of Emotional Distress*, 58 Fordham L.Rev. 1309, 1322–23 (1990) (arguing traditional tort rules limiting recovery in legal malpractice cases to pecuniary damages do not adequately protect personal client interests). Stated best, " 'The critical inquiry becomes whether the kind of interest invaded is of sufficient importance as a matter of policy to merit protection from emotional im-

pact.' " *Holliday*, 264 Cal.Rptr. at 456 (quoting *Hilt*, 707 P.2d at 95).

This question can turn on the adequacy of the remedy a court can give. *See Hilt*, 707 P.2d at 96. Explaining why the plaintiff could not recover emotional distress damages when her attorney's negligence caused her to lose the equity in her home, the *Hilt* court said:

> Plaintiff's invaded interest is solely an economic one; that she was required to engage in legal action regarding that interest does not change its character. She can be adequately compensated by damages for the value of her lost equity and related legal fees.

*Id.* In contrast, a court permitting emotional distress damages in a legal malpractice case surrounding unauthorized disclosure of information in an adoption proceeding said:

> Since no economic "claim" was impaired by counsel's alleged negligence, the "suit within a suit" framework typically utilized in adjudicating legal malpractice actions, has no application. Consequently, without the ability to seek redress for emotional distress damages, negligent counsel would have virtual immunity for any malpractice committed when retained for non-economic purposes. The unfairness of such a result is quickly manifest given the wide variety of attorney–client relationships other than adoption proceedings, which are not predicated upon economic interests. Drafting a living will, contested child custody or visitation disputes, criminal defense work, as well as numerous pursuits in the general equity courts are but a few examples. In such instances one would be unable to quantify any economic loss. On the other hand, severe mental and emotional distress, resulting from the loss of custody or visitation

rights, or wrongful incarceration, is readily foreseeable.

*Kohn*, 656 A.2d at 1324.

As the First Circuit declared,

there is little room to doubt that the harm Wagenmann suffered due to Healy's bungling was real and significant, and that the injury was reasonably foreseeable under the circumstances. Any attorney in Healy's position should readily have anticipated the agonies attendant upon involuntary (and inappropriate) commitment to [a state hospital] and the subsequent stigma and fear associated with such a traumatic episode....

Were we to accept the notion that a client's recovery on the grim facts of a case such as this must be limited to purely economic loss, we would be doubly wrong. The negligent lawyer would receive the benefit of an enormous windfall, and the victimized client would be left without fair recourse in the face of ghastly wrongdoing. Despite having caused his client a substantial loss of liberty and exposed him to a consequent parade of horribles, counsel would effectively be immunized from liability because of the fortuity of the marketplace. That Healy was guilty of malpractice in the defense of commitment proceedings, rather than in the prosecution of a civil claim for damages, is no reason artificially to shield him from the condign consequences of his carelessness. We are not required by the law of the commonwealth, as we read it, to reach such an unjust result.

*Wagenmann*, 829 F.2d at 222.

** C. Current Principles of Emotional Distress Damages in Negligence Claims.** The task of deciding whether damages for emotional harm are compensable in negligence claims requires us to determine when a duty of care exists to protect against such harm. Critical to this determination is an examination of whether an actor's conduct occurs in the course of specified categories of activities, undertakings, or relationships in which negligent conduct is especially likely to cause serious emotional harm. *See* Restatement (Third) of Torts: Liability for Physical and Emotional Harm § 47 (2012). Over time, our experiences have identified some of these relationships, and the march of history may identify additional undertakings and relationships in the future. Above all, the existence of a duty of care to protect against emotional harm in negligence claims will turn on the nature of the relationship between the parties, as well as the nature of the transaction or arrangement responsible for creating the relationship.[13]

---

**13.** We note this approach is consistent with our caselaw and the Restatement (Third) of Torts in using the duty analysis to determine whether " 'a particular person is entitled to be protected from a particular type of harm.' " *Thompson v. Kaczinski*, 774 N.W.2d 829, 834 (Iowa 2009) (quoting *J.A.H. ex rel. R.M.H. v. Wadle & Assocs., P.C.*, 589 N.W.2d 256, 258 (Iowa 1999)). As we explained in *Thompson*, "in exceptional cases, the general duty to exercise reasonable care can be displaced or modified ... 'based on articulated policies or principles that justify exempting ... actors from liability or modifying the ordinary duty of reasonable care.' " *Id.* at 835 (quoting Restatement (Third) of Torts: Liability for Physical and Emotional Harm § 7 cmt. *j*, at 82 (2010) [hereinafter Restatement (Third)] ). While we addressed scenarios involving physical harm in *Thompson*, the analysis is equally applicable in cases involving stand-alone emotional harm, as recognized in the Restatement (Third). *See* Restatement (Third) § 47 cmt. *d*, at 177; *see also id.* § 7 cmt. *m*, at 83.

As we have explained, recovery for stand-alone emotional harm has historically been more circumscribed than recovery for physical harm, and courts have expressed the limitations in no-duty, limited-duty, and modified-

Yet, the imposition of a duty of care is not predicated on the existence of a highly emotional relationship alone. *See*

duty rulings over the years. *See, e.g., Clark v. Associated Retail Credit Men of Washington, D.C.*, 105 F.2d 62, 64 (D.C.Cir.1939) ("The law does not, and doubtless should not, impose a general duty of care to avoid causing mental distress."); *Hedgepeth v. Whitman Walker Clinic*, 22 A.3d 789, 796 (D.C.2011) ("[B]y framing the question in terms of 'duty,' instead of proximately caused damages, courts have purposely developed the common law to balance competing societal interests.... Having rejected a 'general' duty of care to avoid causing emotional distress, courts ... have imposed liability for the negligent infliction of emotional distress only in limited situations, when additional factors are present that avoid or mitigate [historical policy concerns]."); *Asuncion v. Columbia Hosp. for Women*, 514 A.2d 1187, 1189 (D.C.1986) (observing "some state courts in recent years have recognized" a duty, "at least for physicians, to refrain from negligently inflicting emotional distress"); *cf.* Magruder, 49 Harv. L.Rev. at 1045 n. 49 ("The question here really is whether the law should recognize a duty of care to convey bad news tactfully so as to minimize the risk of physical consequences from sudden shock. In the absence of authority on the point, it may be surmised that such a duty would be recognized only in a very extreme case.").

As we have also explained, however, courts have long found liability for conduct causing serious emotional damage in limited classes of cases, invoking policy considerations in the process. While courts have often considered whether an actor reasonably should have foreseen emotional harm in determining whether emotional harm is recoverable, the Restatement (Third) explains, and we agree, that foreseeability alone cannot appropriately be employed as the standard for limiting liability for emotional harm. *See* Restatement (Third) § 47 cmt. *i*, at 180. Instead, consistent with our analysis in *Thompson* and consistent with the approach of the Restatement (Third), we think the policy issues "surrounding specific categories of undertakings, activities, and relationships must be examined to determine whether they merit inclusion" among the exceptions to the general historical rule of no liability for emotional damages. *Id.* Our consideration of historical and con-

*Lawrence*, 534 N.W.2d at 422. Instead, the inquiry narrows more specifically to further consider the policy considerations

temporary policy concerns guides our liability analysis and compels our conclusion that liability may be appropriate in the narrow class of cases recognized here. *See, e.g., id.* Reporters' Note § 47 cmt. *f*, at 190 (" 'When the defendant owes an independent duty of care to the plaintiff, there is no risk of unlimited liability to an unlimited number of people. Liability turns solely on relationships accepted by the defendant ....' " (quoting 2 Dobbs § 396, at 611)); Dan B. Dobbs, *Undertakings and Special Relationships in Claims For Negligent Infliction of Emotional Distress*, 50 Ariz. L.Rev. 49, 57 (2008) ("[The] fear of unlimited lawsuits that so often causes emotional distress in judges and lawyers is wholly misplaced when it comes to duties based on undertakings or special relationships. Only those in the relationship with the defendant or to whom he undertakes a duty could possibly recover based on the undertaking.").

Finally, we also observe this approach appears fundamentally consistent with the approach taken by Restatement (Second) of Contracts discussed above. *See* Restatement (Second) of Contracts § 353, at 149. Indeed, although courts have historically phrased the inquiry in terms of foreseeability, contract scholars have long recognized the rule regarding awards of emotional distress damages in contract actions is infused with policy considerations related to protection from emotional harm, not the emotional harm's foreseeability: Professor Farnsworth points out the prohibition on awards of emotional distress damages in breach-of-contract actions may have existed as an independent policy-based limitation on the amount of damages in contract actions even when emotional distress damages were foreseeable and certain. *See* 3 E. Allan Farnsworth, *Farnsworth on Contracts* § 12.17, at 291 (3d ed.2004). As Professor Corbin puts it, "While some courts [refuse to permit emotional distress damages for breach of contract] because such damages are too remote to have been within the contemplation of the parties, it seems apparent that most courts have forged 'a rule of policy defining the limits of business risk.' " 11 Joseph M. Perillo, *Corbin on Contracts* § 59.1, at 535–36 (rev. ed.2005) (quoting Charles T. McCormick, *Handbook on the Law of Damages* § 145, at 593 (1935)).

surrounding a particular class of cases and whether negligent conduct within the relationship is very likely to cause severe emotional distress. This is an important limiting consideration. Not all negligence is very likely to cause severe emotional distress, and a duty of care to protect against emotional harm does not arise unless negligence is very likely to cause severe emotional distress. *See* Restatement (Second) of Torts § 436A cmt. *b* (1965); *see also Oswald*, 453 N.W.2d at 639.

To help identify those relationships in which negligent conduct is especially likely to cause severe emotional distress, we have primarily considered any remoteness between the negligent conduct and the harm to the plaintiff. *See Lawrence*, 534 N.W.2d at 422; *see also dePape v. Trinity Health Sys., Inc.*, 242 F.Supp.2d 585 (N.D.Iowa 2003). The role of remoteness, for example, was highlighted in *Lawrence*. In *Lawrence*, the negligent preparation of a bankruptcy petition by an attorney required the intervention of the actions of another entity before the threat of emotional damage to the client would emerge. 534 N.W.2d at 422–23. This type of causation is a common component of legal malpractice claims. To resolve the question whether a duty existed in *Lawrence*, we looked to the policy considerations that drove our decision in *Millington v. Kuba*, 532 N.W.2d 787 (Iowa 1995), to reject a claim of negligent infliction of emotional distress arising out of the wrongful cremation of a body of the father of the plaintiffs. Despite the highly emotional component of the relationship between the family and funeral director in *Millington*, we observed in *Lawrence* that the plaintiffs in that case "were too far removed from the defendants' alleged negligent conduct to cause the imposition of a duty on the defendants to exercise ordinary care to avoid causing emotional harm

to the plaintiffs." *Lawrence*, 534 N.W.2d at 422. The plaintiffs in *Millington* neither experienced nor observed the cremation, but were located out of state at the time. 532 N.W.2d at 793. Thus, remoteness between acts of negligence and the plaintiff militates against a duty of care by making the emotional harm less likely to result from the relationship.

In the area of attorney malpractice, remoteness is often a factor because the emotional harm to the client normally results from an adverse decision by a court or other entity that was influenced by the earlier alleged negligent act of the attorney that may or may not have made it more likely that the adverse decision would follow. As we observed in *Lawrence*, if the government had decided not to prosecute the plaintiff for fraud, the negligence of the bankruptcy attorney would not have supported a claim for emotional damages. 534 N.W.2d at 422. The negligent act by the attorney in the case was not the type that made it very likely to produce emotional harm associated with becoming the target of a criminal prosecution.

In contrast, in *Oswald*, negligent conduct of a doctor and hospital staff within a physician–patient relationship was found especially likely to cause severe emotional distress when the conduct was specifically directed at the plaintiff. 453 N.W.2d at 639. This same approach of finding negligent conduct to be especially likely to cause severe emotional distress when the plaintiff is in the direct path of the course of conduct arising from the relationship was observed in *Meyer* and *Mentzer*.

**D. Emotional Distress in Attorney Malpractice Claims in the Immigration Context.** We have not yet had occasion to interpret *Lawrence* in the context of an attorney-client relationship in the area of immigration, but the issue has

been addressed in *dePape*. 242 F.Supp.2d at 615–17. In *dePape*, a Canadian doctor was hired by an American medical group to work in Fort Dodge, Iowa. *Id.* at 591. The doctor planned to work at the medical group for at least five years and perhaps for the rest of his career. *Id.* He formed an attorney–client relationship with an American immigration law firm, Blumenfeld, for the purpose of obtaining permission to enter the United States for work. *Id.* The doctor's relationship with the law firm was almost devoid of personal contact; most of the contact went through a representative of the medical group, Megan Hutto. *Id.* at 592–93. Similarly, much of the legal communication the doctor received went through the law firm's oft-used local counsel, Jim Eiss. *Id.* at 597.

The firm did not advise him to take a certain series of tests, which would allow him to obtain one of the two methods of entry available to him, the H-1B visa. *Id.* at 592. The H-1B visa allows immigrants to establish residency. *Id.* The firm apparently pinned its hopes—and Dr. dePape's future—to the TN temporary entry visa. *See id.* at 594–97. Unlike the H-1B, the TN visa does not permit applicants to enter with the intention of establishing indefinite residency in the United States. *Id.* at 594.

The firm sent all its TN visa applicants through Buffalo, New York, which the court found suggested the firm knew its strategy was a sham. *Id.* at 597. Prior to the immigration interview, Eiss revealed to Dr. dePape the firm had lied on his application and indicated he only entered the United States to conduct a temporary community health assessment, not permanently emigrate to become a family doctor. *Id.* at 599. The lawyer also advised Dr. dePape to lie during the immigration interview. *Id.* at 600.

During the immigration interview, the immigration official became suspicious of Dr. dePape and asked why he really wanted to enter the United States. *Id.* When Dr. dePape answered that he planned on becoming a family physician in Fort Dodge, the official rejected his application and sent Dr. dePape back to Canada. *Id.*

Upset, Dr. dePape called the firm, but could reach no one. Eventually, he reached Hutto, who advised him to enter as a visitor, drop off his rental car, and then fly to Fort Dodge. *Id.* Then, Hutto said, they would come up with "plan B." *Id.* Trusting Hutto, Dr. dePape and his fiancée agreed to take this course of action, but were immediately caught by immigration officials. *Id.* Immigration officials called Dr. dePape a liar and searched his vehicle, resulting in emotional distress. *Id.*

Dr. dePape then brought a diversity action in federal court alleging legal malpractice under Iowa law. *Id.* at 591 & n. 1. Regarding emotional distress, the court recounted the general rule of emotional distress damages absent physical injury in tort actions and the contractual-relationship exception. *Id.* at 615. The court distinguished *Lawrence* on the ground that the legal malpractice put the plaintiff "directly in harm's way" rather than creating an opportunity for emotional distress "one step removed" from the legal malpractice. *See id.* at 616. The court was well aware that it was immigration officials, and not Dr. dePape's lawyers, who humiliated him. *See id.*

The court explained:

Here, Blumenfeld was retained to assist Dr. dePape with his immigration, but instead of assisting Dr. dePape, Blumenfeld's negligence placed Dr. dePape directly in harm's way. It should be noted that Blumenfeld would not be liable for the mental distress that might have

accompanied a failed *legitimate* entry attempt because it would be unfair under those circumstances to hold a lawyer responsible for the independent decision of an independent governmental entity. But in this case, Blumenfeld not only failed to provide Dr. dePape with sufficient information for him to make an informed decision about his immigration, moments before the entry attempt, Blumenfeld (through Mr. Eiss) counseled Dr. dePape to lie to INS officials in order to gain entry to the United States under false pretenses.

*Id.*

Two lessons can be gleaned from the court's holding: First, the court implicitly acknowledged immigration proceedings involve a personal interest, rather than pecuniary one, the invasion of which justifies the imposition of a different measure of damages. *See id.* Second, the court recognized that although an unsuccessful, but legitimate, attempt at entry might understandably cause emotional distress to the client, the attorney would not be liable for the failed legitimate attempt. *See id.*

**E. Emotional Distress Damages in This Case.** Turning to the facts of this case, we observe that they reveal the attorney-client relationship and the transaction undertaken by Said involved serious emotional distress. While the emotional component in *dePape* arose from the inability of the plaintiff to enter the United States to obtain a job, as well as the interrogation activities conducted at the border, the emotional aspect of the transaction in this case was far greater because it involved the separation of family members that will last a decade.

It is generally foreseeable that emotional distress would accompany the prolonged separation of a parent and child. *See McEvoy,* 562 P.2d at 542, 544; *see also Person,* 183 Ill.Dec. 702, 611 N.E.2d at

1353 (holding plaintiff could obtain emotional distress damages for loss of custody of children resulting from attorney negligence). In *McEvoy,* as part of a divorce decree, a husband gained custody of a child subject to visitation rights by his ex-wife. 562 P.2d at 542. He was concerned that his ex-wife, a Swiss citizen, might take the child back to Switzerland, where he would be unable to see the child. *Id.* As such, the decree required the lawyer to obtain her passport when she visited the child. *Id.* When the lawyer failed to obtain the passport, the ex-wife took the child to Switzerland. *Id.* The court held that the actions of the ex-wife in taking the child was foreseeable and the father could recover damages flowing from the breach of duty, including emotional distress damages. *Id.* at 543–44.

The United States Supreme Court has also commented on the high emotional stakes of immigration and deportation. In *Bridges v. Wixon,* the Court stated:

> The impact of deportation upon the life of an alien is often as great if not greater than the imposition of a criminal sentence. A deported alien may lose his family, his friends and his livelihood forever. Return to his native land may result in poverty, persecution and even death.

326 U.S. 135, 164, 65 S.Ct. 1443, 1457, 89 L.Ed. 2103, 2120 (1945). Similarly, in *Ng Fung Ho v. White,* the Court stressed the high stakes of deportation in a discussion of due process: "To deport one who so claims to be a citizen deprives him of liberty.... It may result also in loss of both property and life, or all that makes life worth living." 259 U.S. 276, 284, 42 S.Ct. 492, 495, 66 L.Ed. 938, 943 (1922) (citation omitted).

In this case, Said understood, from the beginning, the emotional component of the relationship. In the memorandum he au-

thored as a part of his services, he specifically expressed his understanding of the emotional distress Klever and Nancy would suffer if the government denied their Form I-601 application. Furthermore, a reasonable jury could conclude that, contemplating this emotionally charged situation, Said told Klever and Nancy they had a ninety-nine percent chance of success when he knew that the relatives listed on the Form I-601 waiver applications were not qualifying relatives within the contemplation of the statute. Thus, as in *dePape*, this conclusion would permit a jury to find Said pursued a course of action that had no legitimate chance of success. In pursuing this course of action, evidence exists that would permit a jury to find he knew it was very likely that his conduct would result in emotional harm.

This is not a case that requires us to reconsider the rule we have developed over the years to determine if damages for emotional harm are recoverable in an action for negligence. The exception to the rule, applied to the facts presented to the jury in this case, support emotional distress damages. The relationship involved a transaction charged with emotions in which negligent conduct by the attorney was very likely to cause severe emotional distress. Of course, it is not necessary to go further to decide just where the line between duty and no duty may be drawn. Here, we can draw the line at the nature of this attorney–client relationship and the likelihood that serious emotional harm would result from negligently undertaking the illegitimate course of action. While the relationship was formed for the purpose of establishing a path to citizenship and a means to keeping the family united, Said only pursued an illegitimate course of conduct that had no chance of success if the independent decision-maker followed the law. The negligent conduct was doomed to directly result in a separation of

the family for a decade. In this light, it was the type of relationship in which negligent conduct was especially likely to cause severe emotional distress, supporting a duty of care to protect against such harm.

We reiterate that our holding today is limited: Klever and Nancy's claim for emotional distress damages is viable under the standard we set forth nearly twenty years ago in *Lawrence*. Our law regarding emotional harm has fluctuated over the years, and the vicissitudes of time have shaped a general rule and a substantial exception. We need not depart from this framework today to decide the issue presented.

As intimated by Said, awards of emotional distress damages against attorneys may have a chilling effect on the practice of public interest law. *See Holliday*, 264 Cal.Rptr. at 458. As the California Court of Appeal stated, however,

> we are unwilling to say as a matter of law that the elimination of a single element of damages would improve the legal representation of [public-interest clients] by privately retained counsel or, conversely, that failing to limit damages will decrease the quality of representation [clients] in [public-interest] cases can and should expect from their privately retained lawyers.

*Id.* Importantly, it is not just the nature of the relationship that supports emotional distress damages, but the high likelihood of such damages from negligent acts engaged in by the lawyer. The duty arises when those acts are illegitimate and, if pursued, are especially likely to produce serious emotional harm. Therefore, the standard is not one that threatens the practice of law, but is consistent with the ideals that protect the integrity of the practice of law.

## IV. Punitive Damages.

■ Said argues Klever and Nancy failed to introduce evidence to support an award of punitive damages. He also argues he maintained a good-faith belief that the consulate officials would exercise discretion and grant the applications of Klever and Nancy because he had successfully used a child as a qualifying relative for other clients in the past.

■ Punitive damages are a valuable component of our system of civil justice. *Coster v. Crookham,* 468 N.W.2d 802, 810 (Iowa 1991). As the name suggests, they punish bad behavior and deter future bad conduct. *Northrup v. Miles Homes, Inc. of Iowa,* 204 N.W.2d 850, 861 (Iowa 1973).

■ Punitive damages, however, are not available for conduct that is "merely objectionable." *Coster,* 468 N.W.2d at 811. A plaintiff seeking punitive damages must prove "by a preponderance of clear, convincing, and satisfactory evidence, the conduct of the defendant from which the claim arose constituted willful and wanton disregard for the rights or safety of another." Iowa Code § 668A.1(1)(*a*) (2005).

■ We have explained of the standard,

[c]onduct is "willful and wanton" when

"[t]he actor has intentionally done an act of unreasonable character in disregard of a known or obvious risk that was so great as to make it highly probable that harm would follow, and which thus is usually accompanied by a conscious indifference to the consequences."

*Wilson v. Vanden Berg,* 687 N.W.2d 575, 586 (Iowa 2004) (quoting *McClure v. Walgreen Co.,* 613 N.W.2d 225, 230 (Iowa 2000)). Stated differently:

The acts must manifest a heedless disregard for or indifference to the rights of others in the face of apparent danger or be so obvious the operator should be cognizant of it, especially when the consequences of such actions are such that an injury is a probability rather than a possibility. Recklessness may include willfulness or wantonness, but if the conduct is more than negligence it may be reckless without being willful and wanton. We have required evidence of a persistent course of conduct to show no care with disregard of consequences. If it were not so required, we would be allowing an inference of recklessness from every negligent act.

*Vipond v. Jergensen,* 260 Iowa 646, 650, 148 N.W.2d 598, 600–01 (1967).

Under this record, a reasonable jury could conclude that a lawyer acts with willful or wanton conduct by pursuing a course of action with knowledge that it is contrary to the plain language of the governing statute. In fact, the plaintiffs' expert testified extensively that Said's proffered strategy was meritless. Given the high stakes of an immigration application, advising clients to engage in a strategy that is meritless (with the singular hope that the official exercises discretion not apparent from the face of the statute), without similarly advising them of the significant risks attending the strategy, can be said to "manifest a heedless disregard for or indifference to the rights of others in the face of apparent danger or be so obvious the operator should be cognizant of it, especially when the consequences of such actions are such that an injury is a probability rather than a possibility." *Id.* Said not only failed to make these risks clear, but he also told Klever and Nancy they somehow had a good chance of success by pursuing this strategy. This evidence is enough to at least infer Said was reckless. This evidence also supports a deductive inference that Said lied: (1) if

the records demonstrating success with this strategy are unavailable, it is because they do not exist; (2) if the records do not exist, Said lied to the court; (3) if Said thus lied about the records' existence to the court, he may have been lying to Klever and Nancy about the probability of success of his Form I-601 strategy. Accordingly, the jury should have considered the claim for punitive damages.

### V. Conclusion.

The district court erred in concluding emotional distress damages and punitive damages were not available to Klever and Nancy. Accordingly, we affirm the decision of the court of appeals, reverse the decision of the district court, and remand the case for a new trial on damages. The trial shall be limited to the claims for emotional distress and punitive damages.

**DECISION OF COURT OF APPEALS AFFIRMED; DISTRICT COURT DECISION REVERSED; CASE REMANDED FOR NEW TRIAL.**

All justices concur except WATERMAN, J., who dissents, and MANSFIELD, J., who takes no part.

WATERMAN, Justice (dissenting).

I respectfully dissent. Today's opinion marks the first time an Iowa appellate court has allowed a claim for emotional distress to proceed in a legal malpractice action. The majority errs by failing to apply Iowa's long-standing general rule disallowing emotional distress awards in professional negligence actions against attorneys. *See Lawrence v. Grinde*, 534 N.W.2d 414, 417, 422–23 (Iowa 1995) (vacating emotional distress award against bankruptcy attorney whose negligent mistake led to plaintiff's indictment, arrest, and trial on felony fraud charges). *Lawrence* is not overruled by the majority and remains good law. I disagree that today's

case falls within the limited exception allowing claims for emotional distress in professional negligence actions arising from " 'contractual services that carry with them deeply emotional responses in the event of breach.' " *Id.* at 421 (quoting *Oswald v. LeGrand*, 453 N.W.2d 634, 639 (Iowa 1990)).

*Oswald*, a medical malpractice action, involved the death of plaintiff's newborn baby. 453 N.W.2d at 637. The facts here are quite different. Plaintiff Klever Miranda is a noncitizen who was in the country illegally and was already subject to a federal deportation order when he retained attorney Michael Said in 2002. Said ultimately advised Miranda and his noncitizen wife, plaintiff Nancy Clotilde Campoverde, to return to their native Ecuador and attempt reentry. They had been living in the Des Moines area along with their adult children and grandchildren. Relying on Said's advice, Klever and Nancy traveled to Ecuador, but were denied reentry into the United States and triggered a ten-year bar on reentry. Their children and grandchildren, all U.S. citizens, remained in Iowa. But for Said's bad advice, plaintiffs would have continued to reside with their family in Iowa, albeit illegally. Plaintiffs sued Said for malpractice, and the Polk County jury found Said acted negligently and awarded damages in the amount of attorney fees the plaintiffs had paid Said. Said does not challenge the negligence finding on appeal. Plaintiffs, however, appealed the district court's directed verdicts dismissing their claims for mental anguish and punitive damages. The court of appeals reversed and remanded for retrial on plaintiffs' claims for mental distress and punitive damages, the decision my colleagues affirm today. I would instead affirm the district court's rejection of those claims.

An immigration lawyer's failed efforts to attain lawful residency status for noncitizens does not fall within the *Lawrence* exception reserved for "extremely emotional circumstances." 534 N.W.2d at 421. This case is nothing like the lone professional malpractice action *Lawrence* referenced as allowing an emotional distress award—*Oswald*, in which medical personnel told a hysterical new mother in the hospital that her prematurely delivered baby was stillborn when in fact the baby, left on an instrument tray for a half hour, was alive but died twelve hours later. *See Oswald*, 453 N.W.2d at 637, 639 ("[T]he birth of a child involves a matter of life and death evoking such 'mental concern and solicitude' that the breach of a contract incident thereto 'will inevitably result in mental anguish, pain and suffering.'" (quoting *Meyer v. Nottger*, 241 N.W.2d 911, 920 (Iowa 1976))). As the district court correctly recognized here:

> The truth of the matter is that in all kinds of cases, you always have disappointment that you are going to deal with if you lose as a person making a claim. You always have disappointment to one level or another. If you are going to be able to recover emotional damages in tort cases, and in particular, in legal malpractice cases, you have to demonstrate an exceptional level of disappointment of emotional involvement, and *so far the state of Iowa has only allowed that in cases that involve death and a personal injury, those kinds of things.*

(Emphasis added.)

"The vast majority of jurisdictions do not allow recovery of emotional distress damages in legal malpractice cases where the claim of malpractice is not premised on intentional acts, physical injury, or particularly egregious conduct." *Vincent v. DeVries*, —— Vt. ——, 72 A.3d 886, 894, 2013 WL 2278097, ¶¶ 20–25 (Vt. May 24, 2013) (surveying caselaw and vacating emotional distress award against attorney whose negligence threatened plaintiff with loss of his home); *accord Lawrence*, 534 N.W.2d at 422 ("The majority view among American jurisdictions is that emotional distress is not a reasonably foreseeable consequence of and does not 'naturally ensue' from an act of legal malpractice." (quoting *Merenda v. Super. Ct.*, 3 Cal.App.4th 1, 4 Cal.Rptr.2d 87, 89 (1992), *disapproved of in part on other grounds by Ferguson v. Lieff, Cabraser, Heimann & Bernstein, LLP*, 30 Cal.4th 1037, 135 Cal.Rptr.2d 46, 69 P.3d 965, 974 (2003))). I would follow *Lawrence* and the vast majority of other jurisdictions.

Today's opinion allowing an emotional distress recovery should be limited to immigration cases in which family members become separated across international borders because of egregiously bad legal advice. The jury verdict essentially established that Said's negligent immigration advice broke up an intact Iowa family. My colleagues in the majority hold a jury could find Said acted so recklessly, willfully, and wantonly that punitive damages may be awarded. The holding of this case should not be extended to allow emotional distress awards based on an attorney's simple negligence. Nor should this case be extended to allow recovery for mental anguish in marital dissolution and custody cases because in such cases the family was *already* fractured by the parents' physical and legal separation and divorce, with attendant stress and mental anguish for family members, before any attorney negligence during the pending litigation.

The majority makes clear that emotional distress damages cannot be recovered from lawyers who negligently handle their clients' business or financial matters, while distinguishing this case because it involves

personal relations.[14] But, the general rule against emotional distress awards in legal malpractice actions also applies in cases involving adoptions, termination of parental rights, child custody, and other matters involving personal relationships. *See, e.g., Leonard v. Walthall,* 143 F.3d 466, 468 (8th Cir.1998) (holding Arkansas law does not allow recovery for mental anguish for legal malpractice and affirming dismissal of action alleging lawyer's negligence caused delay in child's adoption); *Timms v. Rosenblum,* 713 F.Supp. 948, 955 (E.D.Va.1989); *Taylor v. Paskoff & Tamber, LLP,* 29 Misc.3d 1125, 908 N.Y.S.2d 861, 863 (2010) ("Given that plaintiffs conceded that no reported New York case has permitted recovery of emotional distress damages in a legal malpractice action involving representation in adoption or custody matters, the Court sees no reason to depart from well-established appellate authority.").

In *Timms,* the court held emotional distress damages were not recoverable in a legal malpractice action that alleged the lawyer's negligence resulted in the plaintiff's loss of custody of her children for two years. 713 F.Supp. at 949–50, 955–56. The *Timms* court observed that mental anguish is experienced in a wide variety of litigation and that to allow recovery for that element of damages for mishandling a child custody case would open the door to such recoveries in all legal malpractice cases:

The wisdom of precluding mental anguish damages in this case is confirmed by considering the consequences of a contrary ruling. To permit recovery for mental anguish in this case would necessarily extend recovery for mental anguish to all malpractice cases. There is no reason or principle that distinguishes child custody cases from any other professional malpractice cases. The simple truth is that mental anguish attends all litigation. Any lawyer who has practiced for any substantial time in virtually any area of law will immediately confirm that parties in all of these areas make substantial emotional investments in their causes and suffer mental anguish in the event of an adverse result. This is manifestly so in areas of civil litigation involving claims of employment discrimination, wrongful discharge, civil rights violations, handicapped rights violations, labor disputes, worker's compensation and indeed even patent, copyright and corporate disputes. Mental anguish is not restricted to parties to child custody disputes; it is experienced by parties to any lawsuit to the extent they are emotionally involved in the subject of the lawsuit. In short, allowing recovery for mental anguish in this case is to allow it in all professional malpractice cases.

*Id.* at 955.

I would exercise the same restraint as the *Timms* court and continue to disallow

---

14. I do not believe the majority's conflation of tort and contract law ("contort") provides clarity. It is true that professional negligence cases arise from contractual relationships. But, the differences in contract and tort law remain important, particularly in commercial settings. *See Annett Holdings, Inc. v. Kum & Go, L.C.,* 801 N.W.2d 499, 503–04 (Iowa 2011) (reaffirming and discussing economic loss rule that precludes negligence claims for purely financial losses because the parties may allocate risks contractually). Professional malpractice cases fall outside the scope of the economic loss rule. *Id.* at 504 (citing *Van Sickle Constr. Co. v. Wachovia Commercial Mortg., Inc.,* 783 N.W.2d 684, 692 n. 5 (Iowa 2010) (accountant malpractice)). Accordingly, today's decision in no way signals a retreat from the economic loss rule. Nor does it signal a retreat from our caselaw disallowing emotional distress claims in business-fraud cases. *See Cornell v. Wunschel,* 408 N.W.2d 369, 382 (Iowa 1987) ("Submission of an element of damages for mental distress in a business fraud case constitutes prejudicial error.").

claims for negligently inflicted emotional distress in all attorney malpractice actions, including custody cases. It would be difficult if not impossible to separate the mental anguish inherent in the breakup of the marriage and dissolution proceedings from any added emotional distress attributable to the lawyer's mistakes. Courts generally do not permit recovery for the emotional stress inherent in the litigation process. *See Adams v. Cline Agency, Inc.*, Civ. Action No. 10–CV–02758–WJM–KLM, 2013 WL 2444696, at *4 (D.Colo. June 5, 2013) ("[I]n state courts and federal courts alike, plaintiffs generally may not recover for stress and emotional distress caused by the very litigation process in which they are attempting to obtain such recovery.") Today's small step allowing recovery for allegedly reckless advice on immigration law should not be seen as a leap to permitting recovery from lawyers for a client's mental anguish in other cases. Iowa courts can and should continue to disallow recovery for mental anguish for attorney negligence in family law cases. *See, e.g., Crone v. Nestor*, No. 09–0231, 2010 WL 3324923, at *4–5 (Iowa Ct.App. Aug. 25, 2010). In *Crone*, our court of appeals affirmed summary judgment dismissing the plaintiff's mental-anguish claim against her divorce attorney whose alleged negligent failure to set up a trust caused her to lose her home. *Id.* at *4. The *Crone* court correctly recognized that the dissolution proceedings did not fall within the limited exception to the general rule disallowing recovery for emotional distress in professional negligence actions without a physical injury. *See id.; cf. Kunau v. Pillers, Pillers & Pillers, P.C.*, 404 N.W.2d 573, 574, 577–78 (Iowa Ct.App.1987) (affirming summary judgment dismissing emotional distress claim in legal malpractice action in which attorney failed to timely appeal an adverse judgment on an alienation of affec-

tion suit). Cases like *Crone* and *Kunau* remain good law in Iowa.

I do not doubt plaintiffs in this case were heartbroken to be denied reentry into the United States and to be separated from their children and grandchildren still living in Iowa. The majority relies in part on our "recogni[tion] of a claim for negligent infliction of emotional distress connected to witnessing a serious injury to a family member." *See Barnhill v. Davis*, 300 N.W.2d 104, 108 (Iowa 1981). In *Barnhill*, the court drew the line at bystanders who contemporaneously witnessed the accident causing serious injury or death of a close family member. *Id.* We recently declined to move that line to allow recovery when the parent "arrived at the scene immediately after the accident occurred [and] . . . found [her son] lying in the street, unattended and seriously injured." *Moore v. Eckman*, 762 N.W.2d 459, 460, 462–63 (Iowa 2009). We held the parent's emotional distress claim failed as a matter of law even though "her grief may be as great or greater than one who observes the accident." *Id.* at 463. We adhered to stare decisis and declined to open the door wider to emotional distress awards despite the foreseeability of the mental injuries:

"Prior to our *Barnhill* decision, this court had not recognized a right to recover emotional distress damages under any circumstances in the absence of physical injury. We do not now dispute, and plaintiffs' arguments satisfactorily demonstrate, that emotional distress, often severe, will frequently befall members of the family of a severely injured person who do not meet the *Barnhill* requirements. We were not oblivious to this possibility in deciding that case. The requirement of 'sensory and contemporaneous observance of the accident' was purposely adopted so as to not extend liability for emotional distress to

all situations in which such damages are foreseeable. We opt to hold the line on this limitation."

*Id.* at 462 (quoting *Fineran v. Pickett*, 465 N.W.2d 662, 664 (Iowa 1991)). In *Fineran*, we declined to extend *Barnhill* to allow emotional distress claims by the accident victim's parents and sister who arrived at the accident scene two to five minutes after the car struck her bicycle and left her unconscious on the roadway. *Fineran*, 465 N.W.2d at 663–64. We should exercise the same restraint by declining to extend *Miranda* in future legal malpractice actions.

The Restatement (Third) of Torts adheres to "the general rule that an actor is not liable for negligent conduct that causes only emotional harm." Restatement (Third) of Torts: Liability for Physical and Emotional Harm § 47 cmt. *b*, at 176 (2012). The general rule precludes recovery for "negligently caused pure emotional harm . . . even when it is foreseeable." *Id.* § 47 cmt. *i*, at 180. An exception allows recovery for serious emotional harm caused by negligent conduct that "occurs in the course of specified categories of activities, undertakings, or relationships in which negligent conduct is especially likely to cause serious emotional harm." *Id.* § 47(b), at 175. The "specified relationship" is one "fraught with the risk of emotional harm." *Id.* § 47 cmt. *b*, at 176. The examples given include "hospitals and funeral homes for negligently mishandling a corpse and . . . telegraph companies for negligently mistranscribing or misdirecting a telegram that informs the recipient, erroneously, about the death of a loved one." *Id.* None of the accompanying comments or illustrations involves legal malpractice.[15] Moreover, recovery is limited to "serious" emotional harm. *Id.* § 47 cmt. *l*, at 181–82. If we are going to allow emotional distress damages in this case, why not expressly limit recovery to *serious* emotional distress, as we do for bystander cases? *See Barnhill*, 300 N.W.2d at 108 ("[I]t is necessary to ensure that the bystander's claim is serious and has some guarantee of genuineness. As our society becomes more complex, it would be impossible for the law to compensate for every minor disturbance to a person's mental tranquility."); *cf. Meyer*, 241 N.W.2d at 918–21 (requiring "severe" emotional dis-

---

15. The availability of emotional distress damages in legal malpractice actions is addressed in the Restatement (Third) of the Law Governing Lawyers. *See* Restatement (Third) of the Law Governing Lawyers § 53 cmt. *g*, at 393 (2000). Comment *g* provides as follows:

> General principles applicable to the recovery of damages for emotional distress apply to legal-malpractice actions. In general, such damages are inappropriate in types of cases in which emotional distress is unforeseeable. Thus, emotional-distress damages are ordinarily not recoverable when a lawyer's misconduct causes the client to lose profits from a commercial transaction, but are ordinarily recoverable when misconduct causes a client's imprisonment. The law in some jurisdictions permits recovery for emotional-distress damages only when

the defendant lawyer's conduct was clearly culpable (see also, § 56, Comment *g*).

*Id.* Our court has not adopted section 53. I view incarceration and involuntary civil commitments as akin to a physical injury (loss of mobility and freedom). Yet, New York's highest court, in *Dombrowski v. Bulson*, recently held emotional distress damages are not recoverable from a criminal defense lawyer whose negligence lengthened his client's incarceration. 19 N.Y.3d 347, 948 N.Y.S.2d 208, 971 N.E.2d 338, 340 (2012) ("We see no compelling reason to depart from the established rule limiting recovery in legal malpractice actions to pecuniary damages."). Plaintiffs in today's case were not incarcerated; they were denied reentry into the United States where they lacked lawful residency status. They continue to live freely in their home country.

tress to recover for intentional infliction of emotional distress and breach of contract to perform funeral services); *see also Hedgepeth v. Whitman Walker Clinic,* 22 A.3d 789, 817 (D.C.Cir.2011) (limiting recovery to "serious and verifiable" emotional distress that "must be acute, enduring or life-altering" in malpractice action for negligent infliction of emotional distress arising from false diagnosis that plaintiff was HIV positive). The majority opinion is unclear as to whether plaintiffs must prove serious or severe emotional distress.

Courts continue to recognize sound policy reasons against opening the door wider to claims for negligently inflicted emotional distress. The *Hedgepeth* court noted three: "avoiding fictitious or trivial claims, the *difficulty of establishing (or disproving)* the nature and extent of the alleged mental injury, and limiting liability." *Id.* at 795 (citing Restatement (Second) of Torts § 46 cmt. *b,* at 72 (1965); *id.* § 436A cmt. *b,* at 461–62). "Absent compelling reasons, courts and legislatures should be especially reluctant to create new incentives for litigation." *Timms,* 713 F.Supp. at 956. "The tort law should encourage a certain level of emotional toughness." *Meyer,* 241 N.W.2d at 918. We should not engender more litigation by relaxing proof requirements for emotional distress claims.

I fear today's decision will have a chilling effect on the willingness of attorneys to practice immigration law in Iowa despite the growing demand for legal services in that field. Malpractice insurance premiums no doubt will increase in light of the newly imposed risk of open-ended tort liability for a client's emotional distress upon deportation or denial of reentry into the United States. Fees will necessarily increase to cover the increased insurance premiums, or lawyers will refrain from practicing immigration law to avoid the higher risks and overhead costs. This is an access-to-justice issue. Allowing emotional distress claims in legal malpractice actions will result in fewer lawyers practicing in the field and higher rates charged by those who do. Persons who need immigration law advice will pay more or have a harder time finding representation. Rather than promoting these impediments to the access to legal services, we should instead follow the lead of New York's highest court, which last year declined to allow emotional distress claims against lawyers whose mistakes led to a client's longer imprisonment. *Dombrowski v. Bulson,* 19 N.Y.3d 347, 948 N.Y.S.2d 208, 971 N.E.2d 338, 340–41 (2012). The *Dombrowski* court recognized that expanding malpractice liability would limit access to justice:

> Allowing this type of recovery would have, at best, negative and, at worst, devastating consequences for the criminal justice system. Most significantly, such a ruling could have a chilling effect on the willingness of the already strapped defense bar to represent indigent accused. Further, it would put attorneys in the position of having an incentive not to participate in post-conviction efforts to overturn wrongful convictions. We therefore hold that plaintiff does not have a viable claim for damages and the complaint should be dismissed in its entirety.

*Id.* Similarly, it is a bad idea to expand the malpractice liability of lawyers practicing immigration law. The societal benefit of compensation for particular plaintiffs will be offset by the reduction in access to immigration law advice and representation. And, it will be hard to draw the line in the next malpractice case against a criminal defense attorney. Surely incarceration warrants emotional distress damages for legal malpractice if such damages are now recoverable by a client who is deported or denied reentry into the United States.

Finally, it is important to note the majority holds that a jury could find Said's conduct in representing the plaintiffs was "reckless" and indeed satisfied the standard for a punitive-damage award under Iowa Code section 668A.1(1)(*a*), which requires a "willful and wanton disregard for the rights or safety of another." Our precedent has allowed emotional distress damages without a physical injury when the defendant committed an intentional tort or acted willfully. *See Niblo v. Parr Mfg., Inc.*, 445 N.W.2d 351, 354–55 (Iowa 1989) (collecting Iowa cases); *cf. Dombrowski*, 948 N.Y.S.2d 208, 971 N.E.2d 338, 340–41 (holding emotional distress damages are not recoverable in legal malpractice action for negligence resulting in longer incarceration, but recognizing broader recovery rights under intentional torts of false imprisonment and malicious prosecution). In *Niblo*, we permitted emotional distress damages for a retaliatory discharge in violation of public policy, as "an intentional wrong committed by an employer against an employee who chooses to exercise some substantial right." *Id.* at 355. We relied on the "vast majority of jurisdictions that base the cause of action for wrongful discharge on intentional tort principles, rather than on negligence, [to] allow recovery for emotional distress." *Id.*

We should continue to disallow emotional distress awards in a legal malpractice action in which the attorney is merely found negligent. *See Vincent*, 72 A.3d at 894, 2013 WL 2278097, at ¶ 20 ("The vast majority of jurisdictions do not allow recovery of emotional distress damages in legal malpractice cases where the claim of malpractice is not premised on intentional acts, physical injury, or particularly egregious conduct."); *cf. dePape v. Trinity Health Sys., Inc.*, 242 F.Supp.2d 585, 616 (N.D.Iowa 2003) (awarding emotional distress damages in a legal malpractice action in which client was detained at the border after lawyer advised him "to lie to INS officials in order to gain entry to the United States under false pretenses"—conduct both intentional and egregious).

For these reasons, today's majority opinion should be limited to its facts and should not be applied to open the door any wider to emotional distress recoveries in legal malpractice actions.