# IN THE COURT OF APPEALS OF IOWA

No. 23-1081
Filed August 7, 2024

**JEFFERY A. LEVINE, II and KENDRA LEVINE, individually and as next of friends to K.L., a minor,**
    Plaintiffs-Appellants,

**vs.**

**MICHAEL BOYD, HEIDI BOYD and R.B.,**
    Defendants-Appellees.
_____

Appeal from the Iowa District Court for Madison County, Michael Jacobsen, Judge.

The plaintiffs appeal the district court's grant of summary judgment on their claims against a teenager and his parents. **AFFIRMED.**

Michael E. Altes (until withdrawal) and Matthew Boles (until withdrawal) and Christopher Stewart (until withdrawal) of Gribble, Boles, Stewart & Witosky Law, Des Moines, and Heidi Miller of The Law Office of Heidi Miller, Pleasantville, for appellants.

Scott L. Bandstra of Bandstra Law Firm, Des Moines, for appellees.

Heard by Schumacher, P.J., and Badding and Langholz, JJ.

**BADDING, Judge.**

"For never was a story of more woe [t]han this of Juliet and her Romeo." William Shakespeare, *Romeo and Juliet*, act 5, sc. 3, l. 309–10.

The star-crossed teenagers in this story of legal woe are fifteen-year-old K.L. and her sixteen-year-old boyfriend, R.B. After a fight with her parents, Jeffrey and Kendra Levine, K.L. ran away from home. She called R.B. for a ride, and he took her to the home of his parents, Michael and Heidi Boyd. K.L. hid in their basement for three days, until law enforcement traced her location there.

The Levines, individually and as next friends of K.L., sued the Boyds and their son for intentional infliction of emotional distress, intentional interference with the parent-child relationship, false imprisonment, negligence, negligent supervision, and parental responsibility for the actions of their minor child. The district court granted the Boyds' summary judgment motion, dismissing all claims against them. The Levines appeal. Because we conclude the undisputed facts establish that the Boyds are entitled to judgment as a matter of law, we affirm the court's ruling.

## I.    Background Facts and Proceedings

The night that K.L. ran away was not the first time she left home without her parents knowing. In early May 2022, shortly after she and R.B. started dating, K.L. snuck out of the house and went to a campground with R.B. He drove K.L. home around 2:30 or 3:30 a.m. K.L.'s mother, Kendra, was waiting for them. The next week, R.B. snuck into K.L.'s room through her bedroom window. K.L.'s father, Jeffrey, found him there and called R.B.'s parents, Michael and Heidi, to come get

him.  After that, K.L.'s parents put an alarm on her windows and took away her cell phone.  But toward the end of May, they found her with a "burner phone."

K.L. testified in a deposition that when Jeffrey caught her with the phone,

> he came across the dining room, and he like grabbed me by the face . . . and then, like, shaking me by my head and hitting my head on the window, and then like threw me to the ground and then yelled at me, and then picked me up by my head . . . and did it again and walked away.

K.L. had bruises under her eyes from Jeffrey grabbing her by the face.[1]  She went to school the next day, but her parents pulled her out during fourth period.  Before she left, one of her friends noticed the bruises and reported it to R.B.'s mother Heidi, who was one of their teachers.  Heidi then made a report to the Iowa Department of Health and Human Services.  K.L. testified that she thought about running away right after this incident, but R.B. told his parents what she was thinking and Heidi relayed that to either the department or law enforcement.

Things between the Levines and Boyds were quiet for about a month.  But shortly after R.B. got back from a family vacation, K.L. moved forward with her plan to run away because she was still upset and unhappy after the incident with Jeffrey in May.  Between midnight and 1:00 a.m. on June 27, K.L. disengaged the alarm attached to her bedroom window.  Before crawling out of the window, K.L. left a note on her dresser saying that she was "safe and out of the state with people from my old high school."  Instead, R.B. picked K.L. up and drove her to the Boyds' house.  R.B. snuck K.L. into his bedroom in the basement, which is accessible without going through the front of the house or its garage.  The basement has two

---

[1] Kendra and Jeffrey denied this fight took place.

bedrooms—one for R.B. and one for his older brother—a living room, and a bathroom. For the three days that she was at the Boyds' house, K.L. mostly stayed in R.B.'s bedroom, hiding from his parents and siblings.

The Levines immediately contacted the sheriff's department when they discovered K.L. was missing in the morning. An officer went to the Boyds' house the next day and spoke to Michael. He asked the officer if he wanted to speak to R.B., but the officer declined and left. During this time, Kendra was also calling and texting Heidi, asking her to talk to R.B. about where K.L. might be. Heidi asked R.B. if he knew anything, but he told her that "he didn't know, she probably ran off with friends from another school." Heidi and Michael testified in their depositions that they had no reason to believe K.L. was in their house. Michael explained that R.B. had told him about K.L.'s note that "she went off with some friends," so he "didn't have any reason to believe that she was anywhere." Heidi similarly testified: "There was no sign of [K.L.] There was no indication she was near my home." If there had been, Heidi said that she "would have called the police immediately or, at the very least, her parents."

But on June 29, law enforcement traced K.L.'s location to the Boyds' residence after K.L. logged into her Snapchat account from a device linked to the household. Officers went to the Boyds' home around 9:00 p.m., where they found K.L. hiding in the basement.

Heidi and Michael were charged with harboring a runaway in violation of Iowa Code section 710.8(3) (2022). The State dismissed the charges a few days after K.L.'s deposition, where she insisted that neither Heidi nor Michael knew that she was hiding in their home. K.L. told her parents the same thing. Yet the Levines

pursued their lawsuit against Heidi, Michael, and R.B., seeking damages for the emotional distress they experienced while their daughter was missing. The Boyds moved for summary judgment on all claims against them and their son, which the district court granted. The court reasoned that none of the Levines' claims could succeed because the undisputed facts established that "Michael and Heidi Boyd were unaware that K.L. was hiding in their residence." The Levines appeal, challenging the court's dismissal of each of their claims.

## II.    Standard of Review

We review a district court's order granting summary judgment for correction of errors at law. *Morris v. Legends Fieldhouse Bar & Grill, LLC*, 958 N.W.2d 817, 821 (Iowa 2021). In reviewing a summary judgment motion, "the court must: (1) view the facts in the light most favorable to the nonmoving party, and (2) consider on behalf of the nonmoving party every legitimate inference reasonably deduced from the record." *Id.* (citation omitted). Summary judgment is appropriate if there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. *Id.*

## III.    Analysis

Taking the Levines' claims out of order, we first address their three intentional torts—intentional infliction of emotional distress, intentional interference with the parent-child relationship, and false imprisonment—before moving on to their negligence and parental responsibility claims.

### A.    Intentional Infliction of Emotional Distress

The first element of a claim for intentional infliction of emotional distress requires the plaintiff to prove that the defendant's conduct was extreme and

outrageous. *White v. Harkrider*, 990 N.W.2d 647, 652 (Iowa 2023). "It is for the court to determine in the first instance, as a matter of law, whether the conduct complained of may reasonably be regarded as outrageous." *Id.* (cleaned up) (citation omitted). The conduct must be "so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Id.* (citation omitted). "Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!'" *Smith v. Iowa State Univ. of Sci. & Tech.*, 851 N.W.2d 1, 26 (Iowa 2014) (citation omitted). This is an exceedingly high standard to meet. *White*, 990 N.W.2d at 653.

The district court found the Levines could not meet that standard under the undisputed facts here, reasoning:

> Michael and Heidi Boyd were unaware that K.L. was hiding in their residence. Under no set of facts alleged by Plaintiffs can they establish a prima facie case of intentional infliction of emotional distress against Michael and Heidi Boyd.
> R.B. assisted K.L. in hiding at the Boyds' residence, however, the Plaintiffs cannot establish a prima facie case of intentional infliction of emotional distress against R.B. R.B.'s actions and conduct cannot reasonably be regarded as outrageous.

We agree.

The Levines focus their argument on how Heidi and Michael's inaction affected them, arguing: "K.L. ran away from the Levines' home and hid in the Boyds' basement for three days with R.B.'s help. Despite continuous conduct by the Levines and law enforcement present Michael and Heidi lived willfully blind to

what was happening in their home."[2]  Our cases are clear, however, that more than inaction is needed to establish outrageous conduct:

> It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by "malice," or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort.

*Northrup v. Farmland Indus., Inc.*, 372 N.W.2d 193, 198 (Iowa 1985) (citation omitted).  The Boyds' failure to discover K.L. in their home does not fit within that definition of outrageous conduct.

As for R.B.'s conduct, we agree with the district court that his actions in helping K.L. hide in his parents' basement for three days after she ran away from home are not sufficiently extreme in degree to survive summary judgment.  *See, e.g.*, *Lennette v. State*, 975 N.W.2d 380, 392 (Iowa 2022) (finding an inadequate investigation by a social worker that led to the removal of a child from her father for several months was not outrageous conduct).  The out-of-state cases the Levines rely on to support their argument that the "unilateral separation of a child from its parent can be extreme and outrageous conduct" involved parties who purposefully separated a parent from a child.  *See Pankratz v. Willis*, 744 P.2d 1182, 1189 (Ariz. Ct. App. 1987) (finding grandparents' conduct was extreme and outrageous because they gave their daughter financial and other assistance so that she could disappear with her child and permanently deprive the father of contact); *Bartanus v. Lis*, 480 A.2d 1178, 1185–86 (Pa. Super. Ct. 1984) (concluding plaintiff's complaint for intentional infliction of emotional distress

---

[2] The Levines do not challenge the district court's determination that Heidi and Michael were unaware that K.L. was hiding in their home.

alleged sufficient facts to survive dismissal where defendants "intentionally manipulated" and alienated the plaintiff's son). That is not the situation here, where the undisputed facts show that K.L. *independently* chose to run away from her parents because she was upset and unhappy. While R.B. concealed K.L.'s location after she ran away, there is no evidence that he encouraged her to leave her parents' home or intentionally manipulated her into doing so. We accordingly affirm the district court's grant of summary judgment on the Levines' claim for intentional infliction of emotional distress against the Boyds and their son.

## B.      Intentional Interference with Parent-Child Relationship

To establish a claim for intentional interference with the parent-child relationship, a plaintiff must show: (1) they have a legal right to establish or maintain a parental or custodial relationship with their minor child; (2) the defendant took some action or affirmative effort to abduct the child or to compel or induce the child to leave the parent's custody; (3) the abducting, compelling, or inducing was willful; and (4) the abducting, compelling, or inducing was done with notice or knowledge that the child had a parent whose rights were invaded and who did not consent. *Lennette*, 975 N.W.2d at 390.

The district court found the Levines' claim failed on the second and third elements, reasoning: "There is no evidence that Michael and Heidi Boyd or R.B. took some action or affirmative effort to abduct K.L. or to compel K.L. to leave the Levines' custody," or that they "willfully abducted, induced, or compelled K.L. to run away from home and hide at the Boyds' residence." The Levines challenge this conclusion, arguing there is a "plethora of established evidence that each of the Boyds intentionally interfered with the Levines' parent-child relationship." But

they do not identify any of that evidence. And there is plenty of evidence in the record, even upon viewing it in the light most favorable to the Levines, that K.L. left on her own without any involvement from the Boyds.

When asked why she ran away, K.L. testified: "I just felt like I wasn't, like, happy. I don't know. It just upset me with the whole, like incident—if that's what I can call it—happening. . . ." She did not speak to Heidi or Michael before or after she ran away. In fact, she had never met Michael or been to the Boyds' house before. And, as discussed above, while R.B. helped K.L. after she left her parents' house, there was no evidence that he compelled or induced K.L. to leave her parents' custody. *Cf. Wolf v. Wolf*, 690 N.W.2d 887, 893 (Iowa 2005) (finding that a mother induced a minor child to leave her father's custody by purchasing the child an airline ticket and giving her a credit card and cellphone battery). Indeed, when K.L. first told R.B. about her plans to run away right after the fight with her father, R.B. told his mother about it. Because the Levines failed to set forth specific facts showing the existence of a genuine issue of material fact on this claim, we conclude the district court correctly granted the Boyds' summary judgment motion. *See Walderbach v. Archdiocese of Dubuque, Inc.*, 730 N.W.2d 198, 200 (Iowa 2007) ("Speculation is insufficient to create a genuine issue of material fact.").

### C.    False Imprisonment

The Levines next claim the district court erred in granting the Boyds summary judgment on their claim for false imprisonment. An essential element of that tort is the "detention or restraint against one's will." *Valadez v. City of Des Moines*, 324 N.W.2d 475, 477 (Iowa 1982) (citation omitted). The district court

found that was missing here because "K.L. voluntarily ran away from home. R.B. assisted K.L. to hide and stay at the Boyds' residence. K.L. hid in the Boyds' residence without Michael and Heidi Boyds' knowledge. There is not an unlawful restraint or detention in this case." We agree. *See, e.g., Ette v. Lin-Mar Cmty. Sch. Dist.*, 656 N.W.2d 62, 70 (Iowa 2002) (finding that a ninth-grade boy was not confined against his will where he did not object to boarding a bus home from a school trip).

The Levines acknowledge that "a defense to confinement is one of consent on behalf of the imprisoned." *See, e.g., Cruz v. Cent. Iowa Hosp. Corp.*, No. 12-0347, 2012 WL 6194230, at *3 (Iowa Ct. App. Dec. 12, 2012); *accord Zohn v. Menard, Inc.*, 598 N.W.2d 323, 329 (Iowa Ct. App. 1999). But they argue there "was no lawful consent present due to K.L.'s lack of capacity" as a minor. There are two problems with this argument. First, the Levines skipped the question of whether K.L. was detained or restrained at the Boyds' home. The undisputed facts show she was not. *See Sergeant v. Watson Bros. Transp. Co.*, 52 N.W.2d 86, 92 (Iowa 1952) (defining false imprisonment as "the unlawful restraint of an individual's personal liberty or freedom of locomotion" (citation omitted)). Second, K.L.'s capacity to consent was neither raised in nor ruled on by the district court. So error was not preserved. *See Meier v. Senecaut*, 641 N.W.2d 532, 537 (Iowa 2002) ("It is a fundamental doctrine of appellate review that issues must ordinarily be both raised and decided by the district court before we will decide them on appeal."). We accordingly affirm the district court's grant of summary judgment on the Levines' claim for false imprisonment.

### D. Negligence and Negligent Supervision

In separate counts in their petitions, the Levines asserted a general negligence claim against all the Boyds—Heidi, Michael, and R.B.—and a claim for negligent supervision of R.B. against just Heidi and Michael. On appeal, they address the two claims together, so we will as well.

"An actionable negligence claim requires the existence of a duty to conform to a standard of conduct to protect others." *Morris*, 958 N.W.2d at 821 (cleaned up) (citation omitted). "While summary adjudication is rarely appropriate in negligence cases, the determination of whether a duty is owed under particular circumstances is a matter of law for the court's determination." *Id.* (citation omitted). The remaining elements of a negligence claim—a failure to conform to a standard of conduct, factual cause and scope of liability, and damages—are factual questions that are generally entrusted to the factfinder for decision. *Hill v. Damm*, 804 N.W.2d 95, 99 (Iowa Ct. App. 2011).

The district court found the negligence claims against the Boyds failed on the duty prong, reasoning that Heidi and Michael "did not have a duty to protect K.L. in this case. They did not know K.L. was hiding in their residence and there was not a special relationship between K.L. and the Boyds." The Levines argue the court "erred in only focusing on the 'special relationship' of the Boyds and K.L. while failing to give attention to the relationship Michael and Heidi have with R.B." as his parents. We disagree.

"Iowa follows the Third Restatement of Torts in analyzing whether a duty exists to support a negligence claim." *Ruby v. Sheehan*, No. 23-0596, 2024 WL 1548798, at *4 (Iowa Ct. App. Apr. 10, 2024). Under the Third Restatement,

"[a]n actor ordinarily has a duty to exercise reasonable care when the actor's conduct creates a risk of physical harm."[3]  Restatement (Third) § 7.  As we explained in *Ruby*: "This ordinary duty is imposed only when the actor engages in conduct.  In other words, it does not impose an affirmative duty to act.  Instead, the Third Restatement recognizes affirmative duties only in limited circumstances, generally based on a special relationship or other policy principles."  2024 WL 1548798, at *4 (cleaned up); *see also Kindig v. Newman*, 966 N.W.2d 310, 324 (Iowa Ct. App. 2021).  Outside of a special relationship giving rise to an affirmative duty to act, "there is no duty of care when another is at risk for reasons other than the conduct of the actor, even though the actor may be in a position to help."  Restatement (Third) § 37 cmt. b; *accord Hoyt v. Gutterz Bowl & Lounge L.L.C.*, 829 N.W.2d 772, 776 n.4 (Iowa 2013).

One of those special relationships is that between a parent and minor child.  *See* Restatement (Third) § 41(a), (b)(1).  Because of a parent's "responsibility for child-rearing, their control over their children, and the incapacity of some children to understand, appreciate, or engage in appropriate conduct," *id.* § 41 cmt. d,

---

[3] It is undisputed that K.L. did not suffer any physical harm while at the Boyds' home.  *See* Restatement (Third) of Torts: Liab. for Physical & Emotional Harm § 6 (Am. L. Inst. 2010) [hereinafter Restatement (Third)] ("An actor whose negligence is a factual cause of *physical harm* is subject to liability for any such harm within the scope of liability, unless the court determines that the ordinary duty of reasonable care is inapplicable." (emphasis added)); *id.* § 4 (defining "physical harm" to mean "the physical impairment of the human body ('bodily harm')").  Instead, the Levines are seeking damages for the emotional distress they claim the Boyds' negligence caused them.  The general rule in Iowa "is emotional distress damages are not recoverable in torts 'absent intentional conduct by a defendant or some physical injury to the plaintiff.'"  *Miranda v. Said*, 836 N.W.2d 8, 14 (Iowa 2013) (citation omitted).  While that rule is subject to exceptions, *see id.*, the Levines have not identified any that would apply here.  But because the Boyds did not raise this issue before the district court, we do not address it further.

parents owe a duty of reasonable care to third parties to control their children's conduct. *Id.* § 41(a), (b)(1). But "[b]efore liability may be imposed on parents, they must act negligently with regard to risks posed by their minor children." *Id.* § 41 cmt. d; *accord Moore v. Crumpton*, 295 S.E.2d 436, 440 (N.C. 1982) ("The issue in the final analysis is whether the particular parent exercised reasonable care under all of the circumstances."). If an actor neither knows nor should know of a risk of harm the child's actions create, no action is required. *See* Restatement (Third) § 41 cmt. c.

This is consistent with the duty imposed on parents at common law, as our supreme court explained in *Smith v. Shaffer*: "At common law parents are not liable for damages caused by their children unless the damages can be attributed to some action or inaction of the parent." 395 N.W.2d 853, 856 (Iowa 1986). "There are only two situations in which a parent will be held liable: (1) where the child is acting as an agent for the parent; or (2) where the parent's own negligence is the proximate cause of the child's conduct." *Id.* The Levines rely on this doctrine as a source of the Boyds' duty to them and to support their separate negligent supervision claim, arguing "a reasonable jury question arises on whether doing nothing is negligent." We disagree and conclude the district court was correct in finding "there was no action or failure of action by the Boyds that caused R.B. to assist K.L. to hide in their residence."[4]

---

[4] While the district court expressed this in terms of duty, under the Third Restatement it's more accurately described as a finding that Heidi and Michael did not breach their duty of care. *See* Restatement (Third) § 41 reporter's note cmt. c (noting whether parents "knew or had reason to know of the necessity of and opportunity for control" of their children is "subsumed within the analysis of reasonable care," which is a question of breach, not duty). "When no reasonable

The Levines challenge this conclusion, contending that "Heidi and Michael Boyd knew of the relationship between R.B. and K.L., knew they did not have consent to have K.L. at their house, and knew of the situation surrounding K.L.'s disappearance." Missing from that argument is any suggestion, or evidence, that Heidi and Michael knew or had reason to know that R.B. helped K.L. or that she was hiding in their basement. *See Garrison v. New Fashion Pork LLP*, 977 N.W.2d 67, 88 (Iowa 2022) (noting that summary judgment is "the put up or shut up moment in a lawsuit," when the nonmoving party must come forward with evidence that would convince a rational trier of fact to accept its version of events). Without that knowledge, the Levines have not explained how Heidi and Michael acted negligently. *See, e.g.*, *Sowell v. Solomon*, 870 S.E.2d 39, 46 (Ga. Ct. App. 2022) (finding that parents were not negligent in supervising or controlling their child when they had no reason to anticipate their child's bicycle accident); *Damphier v. Brasmeister*, 128 N.Y.S.3d 310, 312 (N.Y. App. Div. 2020) (concluding grandparents were not negligent in failing to supervise their grandchild because they were unaware the child had threatened to harm other people).

The Levines alternatively make a premises liability claim—that because Heidi and Michael owned the home where K.L. was hiding, she was their social guest, and they had the "right to exclude K.L., and thus control [her] actions." Stated another way, the Levines argue that "Heidi and Michael's failure to exercise control over conduct occurring in their home was a breach of their duty" as homeowners. This argument is based on section 318 of the Second Restatement

---

jury could find that there was a foreseeable risk of harm or a failure to exercise reasonable care," courts may find "no liability as a matter of law." *Id.* § 41 cmt. c.

of Torts. But as we explained in *Ruby,* "we are bound to follow more recent precedent applying the duty principles of the Third Restatement," which no longer imposes an affirmative duty on homeowners to control guests. 2024 WL 1548798, at *6, *7 (concluding that "after our supreme court's elimination of foreseeability from the duty analysis and the adoption of section 51 as the new duty analysis for land possessors, the duty to 'control the conduct of social guests'" cannot support a negligence claim (citing *Morgan v. Perlowski*, 508 N.W.2d 724, 728 (Iowa 1993))).

We accordingly conclude the district court was correct in granting the Boyds' summary judgment motion on the negligence and negligent supervision claims against them. In doing so, we decline to address the Levines' argument that the court "erred in not discussing or analyzing R.B.'s negligence surrounding K.L.'s disappearance." This argument was raised for the first time in the Levines' reply brief, which is too late. *See Villa Magana v. State*, 908 N.W.2d 255, 260 (Iowa 2018) ("Generally, we will not consider issues raised for the first time in a reply brief."). And, as the Levines recognize, although the court granted the Boyds' summary judgment ruling in full, it did not expressly address the negligence claim against R.B. The Levines did not bring this oversight to the court's attention. So error has not been preserved on this issue. *See Lamasters v. State*, 821 N.W.2d 856, 864 n.2 (Iowa 2012) ("[I]f the appellant claims as error on appeal that the district court *failed to make sufficiently specific findings and conclusions*, then the appellant must file a rule 1.904 (2) motion to preserve *that* point."); *Meier*, 641 N.W.2d at 539 (stating that a rule 1.904(2) motion "is necessary to preserve error

'when the district court *fails to resolve* an issue, claim, or other legal theory properly submitted for adjudication'" (citation omitted)).

### E.    Parental Responsibility for Actions of Minor Child

The Levines finally claim that the district court erred in dismissing their claim under Iowa Code section 613.16, which provides that the parents of "an unemancipated minor child under the age of eighteen years shall be liable for *actual damages* to the person or property caused by the *unlawful acts* of such child." Iowa Code § 613.16(1) (emphasis added). The court reasoned that because the Boyds and R.B. were "entitled to judgment as a matter of law on all other claims in this matter," they could not go forward with their claim under section 613.16. We agree. *See Hensler v. City of Davenport*, 790 N.W.2d 569, 585 (Iowa 2010) (describing section 613.16 as imposing "vicarious liability upon parents for the tortious damages to persons or property caused by their children").

### F.    Appellate Attorney Fees

This leaves us with the Boyds' request for an award of appellate attorney fees as a sanction against opposing counsel under Iowa Rule of Civil Procedure 1.413(1). The Boyds cited no authority in support of that request, and we have previously held that appellate attorney fees are unavailable as a sanction under rule 1.413(1). *See In re Marriage of Whiteside*, No. 07-0739, 2007 WL 3376902, at *3 (Iowa Ct. App. Nov. 15, 2007) (reasoning that rule 1.413 "does not expressly apply to appellate proceedings" and our rules of appellate procedure "do not refer to or incorporate by reference rule 1.413"). We accordingly deny the request.

**AFFIRMED.**